STATE HIGHWAY COMMISSIONER *v.* DETROIT CITY
CONTROLLER.

1. HIGHWAYS AND STREETS—LIMITED ACCESS HIGHWAYS.

Contract whereby State highway commissioner agreed to use 5/7
of amount legislature limited for annual expenditure upon
limited access highways for such highways in 1 of the 83
counties was not an abuse of discretion on his part, in view
of great concentration of population in, and collection of motor
vehicle weight and gasoline taxes from, such county, and the
relative greater urgency for traffic relief (CL 1948, §§ 252.-
56–252.64, as added by PA 1950, No 22).

2. STATES—LIMITED ACCESS HIGHWAYS—CONSTITUTIONAL LIMITA-
TION ON DEBT.

Obligation of State, as permitted to be created by statute au-
thorizing State highway commissioner to participate in the
construction of limited access highways and pay bonds issued
therefor solely from revenues from taxes on motor vehicles
and fuels used therein, does not fall within the limitation of
the Constitution on the State's borrowing power for the im-
provement of highways and its pledge of credit therefor, since
the credit of the State is not pledged for the payment of such
bonds, the structure being paid for solely by those who use it
(Const 1908, art 10, §§ 10, 11; CL 1948, §§ 252.56–252.64, as
added by PA 1950, No 22).

REFERENCES FOR POINTS IN HEADNOTES

[2–4] 43 Am Jur, Public Securities and Obligations § 285.
[5, 6] 12 Am Jur, Constitutional Law § 386.
[6] 12 Am Jur, Constitutional Law § 396.
[10, 13, 15, 18, 19] 50 Am Jur, Statutes § 534 *et seq.*
[11] 50 Am Jur, Statutes § 357 *et seq.*
[12] 50 Am Jur, Statutes § 347 *et seq.*
[13] In this connection, see 50 Am Jur, Statutes §§ 544, 545.
[16] 50 Am Jur, Statutes § 368 *et seq.*
[17] 50 Am Jur, Statutes § 362.
[18] 50 Am Jur, Statutes § 546.
[19] 50 Am Jur, Statutes § 538.
[23] 14 Am Jur, Costs § 91.

3. Same—Special Funds—Constitutional Limitation on Debt.

Obligations which are payable from revenues set aside for a particular utility or property, acquired with the proceeds of the obligations, do not constitute debts of the State within the prohibition of a constitutional debt limit upon the State's general credit (Const 1908, art 10, §§ 10, 11).

4. Same—Special Fund—State Credit.

The purchaser of an obligation payable solely from a special fund of a State must look solely to such fund as he has no legal redress against the State otherwise, hence, there is no additional general tax burden by reason of such obligation.

5. Constitutional Law—Impairment of Contract—Subsequent Statute.

Neither a subsequent State statute nor an amendment to a State Constitution may impair the obligation of a contract entered into between the State and its subdivisions on the one hand and purchasers of bonds issued by them on the other, since laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if expressly referred to and incorporated in its terms, hence such a pledge made by the government under such circumstances is irrevocable (US Const, art 1, § 10; CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

6. Same—Impairment of Contracts—Statutes—Amendment of Constitution.

An amendment to a State Constitution which has the effect of impairing the security of the holder of a bond for which the State is obligated to pay is invalid, it being treated as the passage of a law, for the purpose of the contracts clause of the Constitution of the United States (US Const, art 1, § 10; CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

7. Same—Impairment of Contracts—Irrevocable Grant of Power of Taxation.

An irrevocable grant of revenues to be derived from a particular source for the payment of bonds is not unconstitutional as a suspension of the power of taxation, since the legislature may still increase the rate of taxation and decrease taxes earmarked for the fund except that they may not be decreased to the extent of impairing the bondholders' security (US Const, art 1, § 10; CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

8. SAME—IMPAIRMENT OF CONTRACTS—MAXIMUM BOND ISSUE—CONTRACTS—SUBSEQUENT STATUTES.

A contract between the State, a county and a city within the county whereby a maximum amount is set for bonds for 2 limited access highway projects, which may be issued thereunder, does not prevent the legislature from subsequently altering such maximum subject to the provision that the obligations of bonds issued will not be impaired (US Const, art 1, § 10; CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

9. STATES—LOAN OF CREDIT—APPORTIONMENT OF COST OF LIMITED ACCESS HIGHWAYS.

The apportionment of the cost of limited access highways among the State, a county and city therein, in which such highways were located, within statutory limitations, does not constitute a lending of the credit of the State to the political subdivisions, since the construction of a highway anywhere within the State is not only of prime importance to the area where located, but is also beneficial to the entire State (Const 1908, art 10, § 12; CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

10. HIGHWAYS AND STREETS—LIMITED ACCESS HIGHWAYS—DISTRIBUTION OF WEIGHT AND FUEL TAXES—CONSTRUCTION OF STATUTES.

The statute empowering joint action by the State, counties and cities in the construction of limited access highways, being special and limited in nature, was not intended to repeal other general acts for the distribution of motor vehicle weight and fuel taxes, especially since the funds required under the limited access highway act constitute but a small fraction of the highway funds received annually and fulfilment of obligations under such act will not interfere with the intention expressed by the more general acts (CL 1948, § 207.119; PA 1949, No 300, § 805; CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

11. STATUTES—CONSTRUCTION.

Apparently conflicting statutes should be construed, if possible, to give each full force and effect.

12. SAME—IN PARI MATERIA.

Statutes *in pari materia* are to be construed together.

13. SAME—CONSTRUCTION—SAME GENERAL SUBJECT MATTER.

All statutes upon the same general subject matter are to be regarded as part of one system and later statutes should be construed as supplementary or complementary to those preceding them.

14. Bonds—Limited Access Highway—Construction of Statutes—Priority.

Bonds issued under statute, providing for construction of limited access highways, which specifically stated it was full authority for such purpose and that it was to be construed as an additional and alternative method therefor and for the financing thereof, thereby evidencing an intent to supplement the scheme for distributing the State highway fund as provided by general acts, would have first priority, subject only to prior obligations, authorized by different acts and secured by the same funds (CL 1948, § 207.119; PA 1949, No 300, § 805; CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

15. Highways and Streets—Limited Access Highways—Construction of Statutes—Supplemental Statutes.

Statute providing for limited access State trunk-line highways by joint action of State, counties and cities was not impliedly repealed by subsequently enacted statute classifying all roads in the State, notwithstanding the later statute did not expressly authorize counties to expend money for the construction of a State trunk-line highway and also provided for priority of 2 classifications ahead of new construction, where the later act specifically repealed other acts and contained authorization for intergovernmental participation by the State, counties and cities in costs on any road or street within a city and the earlier act is to be construed as supplemental to the broad scheme of distribution of State highway funds (CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22; PA 1951, No 51).

16. Statutes—Construction.

Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship or injustice; to favor public convenience and to oppose all prejudice to public interests.

17. Same—Special Statutes Treated as Exception to General Statutes—Intent.

A special statute should be given effect as an exception to a general statute in order to carry out the legislative intent.

18. Same—Construction—Repeal or Modification of Vital Statutes.

An act will not be construed to repeal or modify earlier legislation, if, giving such effect to the act, an apparent purpose would appear to disturb an established system of written law, covering a vital field in our system of government.

19. SAME—IMPLIED REPEALS—IMPORTANT PUBLIC STATUTES.

Repeals by implication are not favored, especially in the case of an important public statute of long standing, which should be shown to be repealed either expressly, or by a strong and necessary implication.

20. BONDS—LIMITED ACCESS HIGHWAYS—PRIORITY OF PLEDGE—OTHER COUNTIES AND CITIES—PARITY OF STATE HIGHWAY COMMISSIONER.

The pledge of defendant city and the county in which it is located, as to bonds payable from funds received for highway construction of limited access highways, would be unaffected as to priority by parity of pledge of State highway commissioner for such purpose in other counties or cities, since additional bonds for the latter would be secured in part by funds allocated to such other counties or cities (CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

21. SAME—LIMITED ACCESS HIGHWAYS—STATE TREASURER.

The validity of bonds to be issued under statute providing for the joint construction of limited access highways by joint action of the State, counties and cities would not be affected by provisions of the intergovernmental contract conferring certain duties of a ministerial nature upon the State treasurer, where some of them fall within the constitutional scope of his office and others, which he could not be required to perform, might be lodged with any acceptable financial institution (CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

22. MUNICIPAL CORPORATIONS—CITY CONTROLLER—CONTRACT FOR LIMITED ACCESS HIGHWAYS.

City controller must sign contract, on behalf of city, with State highway commissioner and board of county road commissioners for construction of limited access State trunk-line highways within city, where there is no legal reason for his refusal to sign such contract (CL 1948, §§ 252.56–252.64, as added by PA 1951, No 22).

23. COSTS—PUBLIC QUESTION—VALIDITY OF BONDS—LIMITED ACCESS HIGHWAYS.

No costs are allowed in test case to determine validity of bonds to be issued for construction of a limited access State trunk-line highway, a public question being involved (CL 1948, §§ 252.56–252.64, as added by PA 1950, No 22).

Mandamus by State Highway Commissioner and others to compel the City Controller of the City of Detroit to execute a contract. Submitted July 6, 1951. (Calendar No. 45,168.) Writ granted October 1, 1951.

*Frank G. Millard,* Attorney General, *Edmund E. Shepherd,* Solicitor General (*Miller, Canfield, Paddock & Stone* and *Wood, King & Dawson,* of counsel), for State Highway Commissioner.

*Paul T. Dwyer,* Acting Corporation Counsel, for City of Detroit.

*John C. Jacoby,* for Wayne County Board of County Road Commissioners.

*Frederick McGraw,* for defendant.

BUTZEL, J. In 1945, the State highway commissioner, herein referred to as the commissioner, the Wayne county board of road commissioners, herein referred to as the county, and the city of Detroit entered into a contract for the construction of 2 limited access highways, herein referred to as the projects, within the city of Detroit. One project, known as the John C. Lodge Expressway, was to begin a short distance from the Detroit river, near Woodward avenue, and run in a more or less northerly and northwesterly direction into a divided 8-lane highway in the northwestern part of the city. The other project, known as the Edsel Ford Expressway was to run in an easterly and westerly direction through the center of the city, and at each end into wide expressways. As of December 31, 1950, some $42,000,000 had been expended for the highways. The 3 participating units had contributed a total of $5,000,000 annually and Federal aid comprised the balance. At the rate of progress under the 1945 contract, it was estimated that it would take an additional 15 years to complete

the projects which were being built in sections as the money became available, and there was no provision for borrowing money to expedite the construction.

At the 1950 extra session of the legislature, Public Act No 22, an amendment to PA 1941, No 205 (CL 1948, § 252.56 et seq. [Stat Ann 1951 Cum Supp § 9.1094(6) et seq.]), was enacted. The entire act, as amended, shall herein be referred as PA 1950, No 22, supra. This act, which shall hereinafter be discussed in more detail, authorized the commissioner to enter into a contract with any county, city or village for the construction of limited access highways to be financed through the proceeds from the public sale of bonds. The act provides that the State, county and city or village should share the costs. It authorizes these units to make an irrevocable pledge of sufficient moneys to pay the bonds, but very carefully limits the nature of the pledge. The act provides that the pledges shall not be a general obligation of the State of Michigan or of the contracting counties or cities, but shall be payable solely from the allocations to the units from the State highway fund.*

On April 17, 1951, under the authority of PA 1950, No 22, supra, the 3 plaintiffs herein, the commissioner, the county, and the city, entered into a contract, referred to in the pleadings as exhibit "A", for the completion of the projects and the financing thereof. Exhibit "A" provides for the issuance of $80,000,000 in bonds payable in serial annual instalments beginning October 1, 1955, with the final payment to be made October 1, 1976, and also semiannual interest on all bonds issued and outstanding at the rate of 2½ per cent. beginning October 1, 1951.

We briefly refer to some of the pertinent clauses

* Now called the motor vehicle highway fund. PA 1951, No 51 (CL 1948, § 247.651 et seq. [Stat Ann 1951 Cum Supp § 9.1097(1) et seq.]).

of exhibit "A", which is dated April 17, 1951, and has been duly signed by all parties thereto, with the exception of defendant. It provides for the issuance of $80,000,000 of bonds to defray the cost of completing the 2 projects which it describes in some detail. It states that it follows the provisions of PA 1941, No 205, as amended by PA 1950, No 22, *supra.* In the payment of interest and principal of the bonds, the State highway commissioner agrees to pay 50%, or $2,500,000 a year, and the other 2 plaintiffs each agree to pay $1,250,000 a year, or 25% a year, for interest and serial payments on the bonds. Each of the plaintiffs irrevocably pledges such annual sums from their share of State highway fund to meet the interest and serial payments on the bonds, and to make the payments to the State treasurer who was made the fiscal agent to pay such amount. It further provides that the State highway commissioner may make additional pledges or pledge within the limits permitted by PA 1950, No 22, *supra,* which pledge or pledges shall be on a parity with that made under exhibit "A". There is a further provision that the county's pledge is subject to a prior one made under the provisions of PA 1943, No 143 (CL 1948, § 141.251 *et seq.* [Stat Ann 1949 Cum Supp, § 9.130(1) *et seq.*]), which provides for the issuance of weight tax anticipation notes.[*]

The contract provides for the method of collection in case of default by the parties or any of them. It further states that all Federal funds received on account of the project shall be used for the redemption of bonds in a prescribed manner. It is distinctly stated that the bonds are not a general obligation of the State but are payable only from the income received from motor vehicle taxes. The right is

---

[*] The supplemental record shows that Wayne county has $5,100,000 of such notes outstanding, the principal being payable serially in annual instalments of $1,020,000 each beginning May 1, 1952.

reserved to issue additional bonds of equal standing by the State if the moneys realized from the bond issue prove insufficient to complete the projects and sets forth the procedure by which this may be done. This requires also a supplemental contract by the 3 parties. Approval of the bonds by the Michigan finance commission, as provided for by P.A 1933, No 94 (CL 1948, § 141.101 *et seq.* [Stat Ann 1949 Rev § 5.2731 *et seq.*]), is also required. Bids for the purchase of the bonds must be approved by the State administrative board, the common council of the city of Detroit, and the board of supervisors and the board of county road commissioners of Wayne county.

The contract further provides that the proceeds from the sale of the bonds shall be deposited with the State treasurer who is designated as fiscal agent for the parties for the payment of principal and interest of bonds and redemption if payments are anticipated before maturity dates. Many other important provisions in exhibit "A" we do not set forth as they are not involved in the discussion of the questions raised.

The purpose of decreasing the building time is evident. The need for the highways is not questioned. At present the Wayne county highway system is inadequate, the movement of vehicular traffic, raw materials and manufactured goods including armament for the government being retarded. Moreover, the construction involves the condemnation of city property, the building of a large portion of the highways below the level of surrounding property, the erection of bridges, the replacement of public utilities and their conduits, and other large costs. The estimates show that if the projects can be completed within 5 years the additional cost will be $134,000,000, but if 15 years are needed, plaintiffs contend in their brief that the cost will be much higher. It is also estimated that a contribution of $80,000,000 by the parties to

exhibit "A" will be sufficient to complete the project, for additional moneys will be forthcoming from Federal aid, from condemned property which will not be immediately destroyed, and other sources.

Defendant is the controller of the city of Detroit. His signature is necessary in order to bind the city to exhibit "A". He has refused to sign and the instant suit for mandamus is brought to direct him to affix his signature to all necessary documents. Defendant has raised several important questions in regard to the validity of the contract and the proposed bond issue and urges that a decision of the questions raised by him is proper before the bonds should be offered for sale. It is conceded that this is a test suit. In a way, it resembles a suit for a declaration of rights.

PA 1950, No 22, *supra,* limits the annual expenditure by the commissioner from his share of the State highway fund to $3,500,000 for limited access highways, and exhibit "A" calls for the annual payment of $2,500,000, or five-sevenths of the maximum amount. Defendant claims that the contract thus casts a burden on the taxing power of the State by leaving a balance of only $1,000,000, or two-sevenths of the entire amount that can be used for limited access highways in other portions of the State should they become necessary. While at first glance it might seem unfair to expend such a large proportion of the maximum amount on the 2 projects, a more realistic approach appears from the stipulation of counsel as to the following facts. The preliminary count of the United States bureau of census for 1950 shows the population of Michigan to be 6,308,-794, of which number over one-third reside in Wayne county and of the latter over three-quarters in the city of Detroit. The population in the metropolitan district of Detroit is 2,973,019, or slightly less than one-half of the entire population of the State. The

records of the State show the receipts from fuel and weight taxes from the entire State amounted to $86,998,723 for 1950, of which $33,010,149 was collected from Wayne county, the latter amount including $25,310,000 from the city of Detroit. The amount collected annually by the State for gasoline and weight taxes has been rapidly growing each year for the past 5 years, it being $58,780,361 in 1946, and $86,998,723 in 1950. There have been large increases in the amounts paid each year by the county of Wayne and the city of Detroit, the amounts received from the metropolitan district of Detroit increasing each year in a larger proportion. The number of vehicles registered in 1950 from the county of Wayne is more than one-third of the total registrations for the State of Michigan. These figures are from records of years prior to 1951. They clearly indicate that with the number of vehicles registered from Wayne county, which includes Detroit, the congestion particularly in Detroit must be very heavy, and with the large amounts respectively paid by Wayne county for fuel and weight taxes, there is nothing unfair or confiscatory in the action of the State highway commissioner in agreeing to continue to appropriate a large amount, as in the past, for the 2 projects and making it possible to complete the projects within a much shorter time. It is true that the residents of the city of Detroit and Wayne county will largely benefit from the construction of the projects, but there will be a benefit to the State as a whole as well. Taxes in their various forms on industry will be used by the State without relation to their origin, and improved transportation will encourage new or expanded industry within the Detroit area. Michigan residents, who do not live in Wayne county, but who have reason to enter it for business or pleasure will reap the benefit of improved transportation. It will be an added inducement to out

state tourists who must travel through Wayne county in order to reach the recreation areas of our State. Finally the improved transportation in and through Detroit is essential to national defense, a matter of importance to everyone.

The commissioner acted fully within his rights as defined by PA 1950, No 22, *supra,* and did not abuse his discretion. If other limited access highways should become necessary, there is still $1,000,000 left under the present law to use for such purpose.

The defendant contends that PA 1950, No 22, *supra,* violates Constitution of 1908, art 10, §§ 10, 11, which provides:

"Sec. 10.   *   *   *   The State may borrow not to exceed 50,000,000 dollars for the improvement of highways and pledge its credit, and issue bonds therefor on such terms as shall be provided by law.

"Sec. 11.   No scrip, certificate or other evidence of State indebtedness shall be issued, except for such debts as are expressly authorized in this Constitution."

PA 1950, No 22, *supra,* § 11, provides in part:

"The total aggregate principal amount of bonds or notes outstanding at any one time issued under any of the provisions of this act shall not exceed $200,000,000."

It is apparent that if the indebtedness authorized by PA 1950, No 22, *supra,* falls within the provisions of sections 10 and 11 the act is unconstitutional. In view of the special nature of the vehicular taxes and the form of the State's obligation as set forth in PA 1950, No 22, *supra,* we do not believe that the debts authorized by it are prohibited by the Constitution.

At the outset, it has long been settled that revenue bonds issued by the State do not fall within the scope

of sections 10 and 11, *supra.* Revenue bonds are issued to raise funds to purchase or construct utilities or other public structures and are payable only from the revenues received from the operation of the utilities or structures. The credit of the State is not pledged for their payment. Nor does the taxpayer pay for the structure, its cost being borne solely by those who use it.

In *Attorney General, ex rel. Eaves,* v. *State Bridge Commission,* 277 Mich 373, we said, quoting from *California Toll Bridge Authority* v. *Wentworth,* 212 Cal 298 (298 P 485):

"The overwhelming weight of judicial opinion in this country is to the effect that bonds, * * * issued by States, cities, counties, * * * if such particular bonds or obligations are secured by and payable only from the revenues realized from a particular utility or property, acquired with the proceeds of the bonds or obligations, do not constitute debts of the particular State, * * * within the definition of 'debts' as used in the constitutional provisions of States having limitations as to the incurring of indebtedness."

Revenue bonds are closely analogous to the bonds issued under PA 1950, No 22, *supra.* First, the funds used to pay the bonds authorized by PA 1950, No 22, *supra,* are not a part of the general funds of the State. Vehicular taxes, almost since their origin, have been earmarked exclusively for highway purposes, PA 1915, No 302 (CL 1948, § 256.1 *et seq.* [Stat Ann § 9.1431 *et seq.*]), PA 1925, No 2. In 1938, the Constitution of 1908 was amended to include article 10, § 22. This section provides:

"All taxes imposed directly or indirectly upon gasoline and like fuels sold or used to propel motor vehicles upon the highways of this State, and on all motor vehicles registered in this State, shall * * *

be used exclusively for highway purposes, including the payment of public debts incurred therefor."

Vehicular taxes have often been termed privilege taxes for the use of the State's highways. They are paid only by motor vehicle owners and users, and the moneys derived therefrom are used solely for the benefit of those persons who paid the tax.

Second, the obligations contained in the bonds are not the obligation of the State of Michigan. Section 12 of P.A. 1950, No 22, *supra,** provides:

"Which bonds or notes shall not be general obligations of the State of Michigan or of any of said issuing municipalities or counties, but shall be payable solely from the proceeds of the highway funds received and to be received, by said governmental unit from the State of Michigan derived from taxes imposed upon gasoline or other motor fuels, and on motor vehicles registered in the State or other funds pledged therefor."

And section 14† provides:

"This act shall not be construed to pledge the full faith and credit of the State of Michigan with respect to any revenue bonds or notes issued under the provisions of the act."

Exhibit "A" contains substantially similar provisions. The bondholders must look only to the revenue derived from motor vehicle taxes for their security. It is clear from the context of article 10, §§ 10, 11 of the Constitution, that it was intended that a limit be placed only upon State indebtedness where the credit of the State has been pledged.

The legislature recognized the closely allied fea-

---

* Adding CL 1948, § 252.62 (Stat Ann 1951 Cum Supp § 9.1094 [12]).—REPORTER.
† Adding CL 1948, § 252.64 (Stat Ann 1951 Cum Supp § 9.1094 [14]).—REPORTER.

tures of the 2 different types of bonds, for in section. 11 of PA 1950, No 22, *supra,** it was provided:

"Which bonds or notes shall be issued in accordance with, and subject to the applicable provisions of Act No 94 of the Public Acts of 1933, as now or hereafter amended, being sections 141.101 to 141.139, inclusive, of the Compiled Laws of 1948." (Known as the revenue bond act.)

For these reasons we find that the constitutional debt limitation will not apply to bonds issued under PA 1950, No 22, *supra.* '

This conclusion has been reached by a large majority of other courts which faced the same problem. In *Gruen* v. *State Tax Commission,* 35 Wash2d 1 (211 P2d 651), the court said (p 51):

"The cases which we have considered state what must be held to be the unanimous view of the courts of this country upon the question of whether or not bonds payable out of a special fund, supplied by an excise tax, constitute a debt within the meaning of constitutional limitations fixing a general debt limitation. Based upon those cases and the cited cases decided by this court, which indicate an approval of the special fund doctrine and, further, that excise taxes are not controlled by constitutional provisions, we hold that the issuance and sale of bonds provided for in this act do not in any way constitute a debt against the State of Washington. The bonds provided for are to be paid from a special fund and solely from anticipated revenues to be derived from the sale of cigarettes. They are not, and cannot be, a general obligation of the State. In the event the anticipated profits do not materialize and the fund becomes exhausted, the purchaser of the bonds has no legal redress against the State. He must look solely to the fund upon which they are drawn.

---

* Adding CL 1948, § 252.61 (Stat Ann 1951 Cum Supp § 9.1094 [11]).—Reporter.

"Whether there would be a moral obligation to redeem the bonds is a matter which does not concern this court. It is sufficient to say there is no legal obligation to do so in the event the special fund is exhausted. In that event, there will be no additional tax burden by reason thereof; for, as just stated, there is no general obligation on the part of the State to redeem the bonds."

See, also, *Ajax* v. *Gregory,* 177 Wash 465 (32 P2d 560); *Alabama State Bridge Corp.* v. *Smith,* 217 Ala 311 (116 S 695); *State, ex rel. Richards,* v. *Moorer,* 152 SC 455 (150 SE 269); *Moses* v. *Meier,* 148 Ore 185 (35 P2d 981); *California Toll Bridge Authority* v. *Kelly,* 218 Cal 7 (21 P2d 425).

The defendant further contends that although exhibit "A" irrevocably pledges funds for the payment of the bonds, the pledge is revocable either by subsequent legislation, or by constitutional amendment, and he claims that since the representation of irrevocability is not true, he should not be required to sign exhibit "A" authorizing the issuance of the bonds. The defendant relies upon Constitution of 1908, art 10, § 9; *Keefe* v. *Oakland County Drain Commissioner,* 306 Mich 503; *Home Building & Loan Association* v. *Blaisdell,* 290 US 398 (54 S Ct 231, 78 L ed 413, 88 ALR 1481); and *Harsha* v. *City of Detroit,* 261 Mich 586 (90 ALR 853).

It is not disputed that when the bonds are issued a contract will be made between the bondholders and the issuing authorities, and that the contract will include the provisions of all relevant existing laws.

"It is also settled that the laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to and incorporated in its terms." *Von Hoffman* v. *City of Quincy,* 71 US (4 Wall) 535 (18 L ed 403).

See *Hammond* v. *Place,* 116 Mich 628 (72 Am St Rep 543) ; *City of Pontiac* v. *Simonton,* 271 Mich 647. Thus the contract will include those acts which authorize the collection of taxes for the State highway fund.

The *City of Quincy Case, supra,* also stands for the proposition that bondholders are protected against subsequent legislation that will impair the contractual obligation evidenced by the bond. In that case the defendant city had issued bonds in order to purchase railroad stock. The Illinois act provided for a special tax to pay the interest on the bonds. Subsequent legislation limited the city's taxing power, the effect being that the city could no longer pay the interest. The supreme court held that the subsequent act was invalid under article 1, § 10, of the United States Constitution as a law impairing the obligation of contracts. The court said:

"When the bonds in question were issued there were laws in force which authorized and required the collection of taxes sufficient in amount to meet the interest, as it accrued from time to time, upon the entire debt. But for the act of the 14th of February, 1863, there would be no difficulty in enforcing them. The amount permitted to be collected by that act will be insufficient; and it is not certain that anything will be yielded applicable to that object. To the extent of the deficiency the obligation of the contract will be impaired, and if there be nothing applicable, it may be regarded as annulled. A right without a remedy is as if it were not. For every beneficial purpose it may be said not to exist.

"It is well settled that a State may disable itself by contract from exercising its taxing power in particular cases. It is equally clear that where a State has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power thus given cannot be withdrawn until the contract is

satisfied. The State and the corporation, in such cases, are equally bound. The power given becomes a trust which the donor cannot annul, and which the donee is bound to execute; and neither the State nor the corporation can any more impair the obligation of the contract in this way than in any other.

"The laws requiring taxes to the requisite amount to be collected, in force when the bonds were issued, are still in force for all the purposes of this case. The act of 1863 is, so far as it affects these bonds, a nullity. It is the duty of the city to impose and collect the taxes in all respects as if that act had not been passed. A different result would leave nothing of the contract, but an abstract right—of no practical value—and render the protection of the Constitution a shadow and a delusion."

The rule of the *City of Quincy Case, supra,* has been consistently followed by the Federal courts. *McGahey* v. *Virginia,* 135 US 662 (10 S Ct 972, 34 L ed 304); *W. B. Worthen Co.* v. *Kavanaugh,* 295 US 56 (55 S Ct 555, 79 L ed 1298), and cases cited therein. See, also, *Hammond* v. *Place, supra;* 156 ALR 1265.

Nor would a constitutional amendment which had the effect of impairing the bondholder's security be valid, for the supreme court has held that an amendment to a State Constitution is passing a law for the purpose of the contracts clause. *Railroad Company* v. *McClure,* 77 US (10 Wall) 511 (19 L ed 997); *Russell* v. *Sebastian,* 233 US 195 (34 S Ct 517, 58 L ed 912, Ann Cas 1914C 1282). The pledge is irrevocable as any statute or amendment to the Constitution impairing the obligation of the bonds would be invalid insofar as it affected bonds theretofore issued. There is no basis for the defendant's objection in this regard.

The authorities cited by the defendant are not inconsistent with this conclusion. Article 10, § 9, of the Constitution of 1908, provides:

"The power of taxation shall never be surrendered or suspended by any grant or contract to which the State or any municipal corporation shall be a party."

Defendant argues that an irrevocable grant would be a suspension of the power of taxation for future legislatures. The contract provides only that the bondholders receive payment from funds derived from the State highway fund. It does not provide how the money is to be collected for that fund. The legislature has retained full power to increase or decrease the taxes earmarked for the fund, or to create new sources of taxation. Of course, existing taxes earmarked for the State highway fund cannot be decreased to such an extent that the bondholders' security is impaired, but subject to that exception, future legislatures retain full control over the tax laws of this State. See *Harsha* v. *City of Detroit, supra,* for a discussion of the subject.

The *Keefe Case, supra,* requires little discussion. The impairment of the obligation was caused by a decline in the value of the property which was the security for the bonds. No State action was directly involved. The *Blaisdell Case, supra,* is not in point. It involved an alteration of the remedy for the enforcement of private contracts only.

In the *Harsha Case, supra,* the plaintiff held a bond of the city of Detroit issued subject to an act which limited the amount the city could borrow to 8% of the assessed valuation of the real and personal property within the city. By a later act the amount the city could borrow was increased to 10% of the assessed valuation. The act was attacked on the ground that it impaired the obligation evidenced by the plaintiff's bond, although there was nothing in the agreement with the city that no future bonds would be issued or that the limit of bonded indebtedness would not be raised. The city could still collect

sufficient moneys to pay the bond. There was nothing in the act which rendered the bonds invalid, and in concluding that no impairment of the obligation had been shown, we recognized the authority of the *City of Quincy Case, supra,* and the *Hammond Case, supra.*

The *Harsha Case, supra,* also refutes the somewhat inconsistent contention of the defendant that exhibit "A" contracts with the bondholders that the maximum amount of the bonds outstanding under PA 1950, No 22, *supra,* will not exceed $200,000,000, and that the annual payments by the commissioner shall not exceed $3,500,000, and that this contract is illegal for it prevents future legislatures from altering these limitations. The defendant is not correct. The contract will have no effect on future legislatures insofar as raising or lowering the authorized amount of indebtedness in PA 1950, No 22, *supra,* is concerned. This statement, again, is subject to the provision that the obligations of the bonds will not be impaired.

The defendant further contends that the contract constitutes a lending of the credit of the State in violation of Constitution of 1908, art 10, § 12, which provides:

"The credit of the State shall not be granted to, nor in aid of any person, association or corporation, public or private."

It is argued that the State's pledge of $2,500,000 annually for 25 years is a grant of credit to the city of Detroit and Wayne county. We have already discussed this contention in part, but for clarity, we shall briefly repeat. The bonds are not payable out of the general funds of the State; they are payable solely from the State highway fund. There has been no pledge of State credit as security for the bonds,

and, therefore, there has been no granting of the credit of the State.

However, even if this were not true, we believe that the pledge would not violate section 12, *supra,* for this is not truly a lending of credit. When a road used as a State highway is built anywhere in Michigan, it is always of prime importance to the area in which it is located, but it is also beneficial to the entire State.

We do not know what proportion of the benefit of the highway will fall upon the balance of the State, nor is that figure ascertainable. However, the legislature has recognized that limited access highways will benefit the State as a whole and has provided for an apportionment of the cost. This is not a lending of credit within the meaning of article 10, § 12.

A question is raised as to the priority the bonds authorized by PA 1950, No 22, *supra,* will have in the funds received by the commissioner, county and city from the State highway fund. PA 1950, No 22, *supra,* provides that each participating unit shall make an irrevocable pledge of the funds necessary to pay the bonds, which pledge shall constitute a first lien on funds collected from motor vehicle taxes held by the State treasurer and payable to the governmental unit as its share of the State highway fund. This portion of the act has been incorporated into exhibit "A", which provides that if the participating unit defaults at any time in making its payment, the State treasurer shall withhold funds due to the unit from the State highway fund until the default is cured.

However, at the time of the passage of PA 1950, No 22, *supra,* a statutory scheme of distribution was in effect toward a major portion of the funds in the State highway fund. CL 1948, § 207.119 (Stat Ann 1950 Rev § 7.309) provided for the distribution of

the gasoline and diesel fuel oil tax, and PA 1949, No 300, § 805 (CL 1948, § 257.300 [Stat Ann 1949 Cum Supp § 9.2505]), the vehicular weight tax. The contents of these sections need not be repeated in detail and reference is made to the acts for a fuller understanding thereof. It will be noted, however, that a portion of the funds were returned to the county and city for general highway purposes.

The problem of construction is not difficult. Since PA 1950, No 22, *supra,* is special and limited in nature, it was obviously not the legislative intent to repeal either PA 1949, No 300, § 805, or CL 1948, § 207.119. Moreover, the funds required under PA 1950, No 22 will constitute but a small fraction of the funds received annually by the State highway fund, so that the fulfilment of the specific provisions of PA 1950, No 22, *supra,* will in no way interfere with the intention expressed by the more general acts. It is the usual rule of statutory construction that apparently conflicting statutes should be construed, if possible, to give each full force and effect. As we said in *Rathbun* v. *State of Michigan,* 284 Mich 521, 544:

" 'Statutes *in pari materia* are to be construed together, and repeals by implication are not favored. The courts will regard all statutes upon the same general subject matter as part of one system, and later statutes should be construed as supplementary or complementary to those preceding them.' *State* v. *Omaha Elevator Co.,* 75 Neb 637 (106 NW 979, 110 NW 874)."

Section 14 of PA 1950, No 22, *supra,** provides:

"This act, *without reference to any other statute or to any charter, shall be deemed full authority for the purposes herein provided* (emphasis added), and

* Adding CL 1948, § 252.64 (Stat Ann 1949 Cum Supp § 9.1094 [14]).—REPORTER.

for the issuance and sale of bonds by this act author-
ized, and shall be construed as an additional and al-
ternative method therefor and for the financing
thereof, any provisions of the general laws of the
State or of any charter to the contrary notwith-
standing."

It was quite clearly the intention of the legislature
to supplement the distribution scheme of the general
acts. Bonds secured by pledges contained in ex-
hibit "A" will be of first priority, subject only to
prior obligations, authorized by different acts and
secured by the same funds.

Had the legislature not again spoken on the sub-
ject, the foregoing discussion would have been suf-
ficient, but in 1951 several acts were passed which
materially affected the amounts of vehicular taxes
and the method of distribution. We have reference
to PA 1951, Nos 51 through 55.* Only PA 1951, No 51
need concern us. It created the motor vehicle high-
way fund, the successor to the State highway fund.
Rather than provide for piecemeal distribution of
the moneys in the fund, as had been done previously,
the act set up a comprehensive system of allocation
to the commissioner and the various subordinate gov-
ernmental units. The act purports to distribute the
entire fund, but no reference is made to PA 1950, No
22, *supra.* We are now asked to determine whether

---

* PA 1951, No 51 (CL 1948, § 247.651 *et seq.* [Stat Ann 1951 Cum
Supp § 9.1097(1) *et seq.*]).
  PA 1951, No 52, amended CL 1948, § 478.6 (Stat Ann 1951 Cum
Supp § 22.565).
  PA 1951, No 53, amended CL 1948, § 250.31 (Stat Ann 1951 Cum
Supp § 9.881).
  PA 1951, No 54, amended title and CL 1948, §§ 207.102, 207.106,
207.108, 207.108a, 207.112, added CL 1948, §§ 207.118b, 207.121-
207.134, repealed CL 1948. §§ 207.201–207.214 (Stat Ann 1951 Cum
Supp §§ 7.292, 7.296, 7.298, 7.298[1], 7.302, 7.308[2], 7.316[1]–7.316
[14], 7.339[1]–7.339[14]).
  PA 1951, No 55, amended CL 1948, §§ 257.801, 257.810 (Stat Ann
1951 Cum Supp §§ 9.2501, 9.2510).—Reporter.

PA 1951, No 51, *supra,* repealed PA 1950, No 22, *supra,* by implication either in its entirety or in part.

PA 1951, No 51, provides that all roads in the State shall fall into only 1 of 5 distinct classifications. They are State trunk-line highways, county primary roads, county local roads, major streets and local streets.

Briefly the money in the motor vehicle highway fund is allocated as follows:

*A.* 44% is allocated to the State highway commissioner to be used for the following purposes in the following priority:

1. Operating expenses for the State highway department.

2. Maintenance of State trunk-line highways.

3. General highway purposes including construction on State trunk-line highways.

*B.* 37% is allocated to the counties to be used for the following purposes, no priority being established:

1. $5,000 each year as salary for an engineer.

2. 75% of the balance for general highway purposes on county primary roads.

3. The remainder for county local roads.

*C.* 19% is allocated to the cities, 70% of which is to be used for the following purposes and in the following priority:

1. Payment of obligations assumed under the Dykstra act * and under contracts allowed by this act.

2. For general highway purposes on the major street system.

3. The remaining 30% to be used for general street purposes on the local street system.

This general act is inconsistent with PA 1950, No 22, *supra,* in at least 2 important respects. *First,*

* CL 1948, §§ 250.31, 250.34 (Stat Ann §§ 9.881, 9.884).—REPORTER.

the county is not expressly authorized to expend money for the construction of a State trunk-line highway. This will be the classification of the projects upon their completion. The effect of this, if the act were strictly construed, would be to vitiate PA 1950, No 22, *supra,* and repeal it by implication, for the county could no longer pledge an annual sum toward the completion of the projects. *Second,* it provides the priority in which the commissioner may spend his funds, and 2 classifications are placed before the construction of new highways. Since PA 1950, No 22, *supra,* had provided that bondholders should have first priority, it is contended that the act seemingly prevents the commissioner from entering into contracts under PA 1950, No 22, *supra.*

There are sections in PA 1951, No 51, *supra,* however, which show that the legislature was treating PA 1950, No 22, *supra,* as supplemental and intended that it continue in effect regardless of the new distribution scheme.

*First,* PA 1951, No 51, § 21, *supra,** lists the acts and sections of acts which were repealed by PA 1951, No 51; this list did not include PA 1950, No 22, *supra.*

*Second,* and most important, PA 1951, No 51, § 13 (f), *supra,*† provides:

"Incorporated cities and villages may provide for consolidated street administration and cities and villages may enter into agreements with the county road commission and with the State highway commissioner for the performance of street or highway work on any road or street within the limits of the city or village or adjacent thereto and for engineering in connection therewith, and such agreements may provide for joint participation in the costs where appropriate."

---

* CL 1948, § 247.671 (Stat Ann 1951 Cum Supp § 9.1097[21]).— REPORTER.

† CL 1948, § 247.663 (Stat Ann 1951 Cum Supp § 9.1097[13]).— REPORTER.

It is evident from this section that the distribution scheme is not as inelastic as it may have first appeared, for in section 13(f) the legislature authorizes intergovernmental participation in street and highway costs on *any road or street* within a city. A fair construction of the act is that this section authorizes the construction of limited access highways. However, we need not rest our decision upon this basis. Even if the section were construed so as not to include limited access highways, it is our conclusion that, under the authorities, PA 1950, No 22, *supra,* must be construed as supplemental to the broad scheme of distribution.

In *Mayor of Port Huron* v. *City Treasurer of Port Huron,* 328 Mich 99, the city of Port Huron attempted to raise money in order to complete a sewage-treatment plant system and garbage-disposal plant. The city had been ordered by this Court to complete the system, and in order to do so within the time allowed, it authorized a $1,300,000 bond issue. The city treasurer refused to countersign the bonds claiming that they had not been approved by the electorate as required by PA 1909, No 279, as amended by PA 1941, No 60, a portion of the home-rule act. The city relied upon a special statute passed in 1927, PA 1927, No 320 (CL 1948, § 123.241 *et seq.* [Stat Ann 1949 Cum Supp § 5.2661 *et seq.*]), which authorized the issuance of bonds without submitting the proposal to the electorate under the special circumstances present in the case. The subsequently passed act had seemingly repealed the 1927 act by implication, for no exceptions had been made to its terms. We said:

"Section 5, subd (g), of the home-rule act in its amended form was passed in 1941 (PA 1941, No 60), and this was subsequent to the enactment of PA 1927, No 320, but which act we do not believe was repealed by implication. PA 1927, No 320, *supra,*

is a special act that applies to a situation as is presented in the instant case.

"In *Boyer-Campbell Co.* v. *Fry,* 271 Mich 282, 297 (98 ALR 827), we said:

" ' "Statutes will be construed in the most beneficial way which their language will permit to prevent absurdity, hardship or injustice; to favor public convenience and to oppose all prejudice to public interests." 2 Lewis' Sutherland, Statutory Construction (2d ed), § 490.'

"A special statute shall be given effect as an exception to the general statute in order to carry out the legislative intent. *Board of Education* v. *Blondell,* 251 Mich 528. When a general intention is expressed and also a particular intention which is incompatible with the general one, the particular intention shall be considered as an exception to the general one. *Attorney General, ex rel. Owen,* v. *Joyce,* 233 Mich 619; *Heims* v. *School District No. 6 of Davison Township,* 253 Mich 248, and cases therein cited. Also, see *Reed* v. *Secretary of State,* 327 Mich 108. In *Attorney General, ex rel. Owen,* v. *Joyce, supra,* we held that the special act providing that the board of supervisors might fill vacancies in the office of road commissioner was not repealed by a later general act which provides for the filling of vacancies and appointments of county offices by the probate court, county clerk and prosecuting attorney, the later act not containing a repealing clause. We quoted the following:

" 'An act will not be construed to repeal or modify earlier legislation, if, giving such effect to the act, an apparent purpose would appear to disturb an established system of written law, covering a vital field in our system of government.' 25 RCL, p 919.

" 'The principle that the law does not favor repeals by implication is of especial application in the case of an important public statute of long standing, which should be shown to be repealed either expressly, or by a strong and necessary implication.' 25 RCL, p 920.   *   *   *

" ' "When a general intention is expressed, and also a particular intention which is incompatible with the general one, the particular intention shall be considered an exception to the general one." 1 Lewis' Sutherland, Statutory Construction, p 532, § 275.' "

In accordance with the authority above cited, we must hold that PA 1950, No 22, *supra,* shall be considered as supplemental to the later general plan, just as it was supplemental to the earlier general plan, and that the provisions of PA 1950, No 22, were unaffected by PA 1951, No 51, *supra.*

The defendant raises questions as to the priority of bonds issued under exhibit "A" in relation to other bonds issued for highway purposes under this or other acts of the legislature. In this regard, our opinion is merely advisory, and regardless of the answer, the defendant would have no legal basis for his refusal to sign exhibit "A". The validity of the bond issue under consideration presents the question of primary importance in the instant case.

Bonds previously issued, which will be payable from the same funds as the bonds in question, will, of course, retain whatever priority they may have had. This contingency presents no difficulty as the indebtedness of Wayne county is comparatively small, and the city of Detroit has no obligations payable from these funds. Future obligations, under different acts, payable from the same funds will not take priority.

All bonds issued under PA 1950, No 22, *supra,* will have identical priority insofar as the funds pledged by the commissioner are concerned, for the statute authorizes no priority between the several issues. This is recognized in exhibit "A", which provides in section 6 that any additional pledges under the act "shall be on a parity with the pledge herein contained." If additional bonds are issued under this

act for limited access highways in other counties or cities, the pledge of these units will be secured by funds allocated to those counties or cities from the State highway fund and will in no way affect the pledge of Wayne county and the city of Detroit.

The defendant's final contention is that exhibit "A" imposes duties upon the State treasurer which are not authorized by PA 1950, No 22, *supra.*

Article 6, § 1, of the Constitution of 1908, provides that the State treasurer shall "perform such duties as may be prescribed by law." PA 1950, No 22, *supra,* does not specifically impose upon the State treasurer any duties with regard to this bond issue. Exhibit "A", however, designates the State treasurer as fiscal agent, *and subject to his acceptance in writing* (emphasis ours), imposes upon him the following duties:

As fiscal agent, all funds used in connection with the projects pass through the State treasurer's hands. He is authorized to collect the quarterly instalments payable by the 3 participating units, and in the event that any of them should default, he is authorized, after notice in writing to the defaulting party or parties, to withhold the first funds due to the defaulting party or parties from the State highway fund until the default is cured. He is to receive additional funds forthcoming from the Federal government for and in aid of the projects and the funds paid by purchasers of the bonds, and deposit them in a specified manner. He is to designate banks and trust companies to act as paying agents for the bonds (subject to the approval of the administrative committee which is composed of officers of the 3 participating units), and to set up a separate deposit fund to be used for the payment of principal and interest on the bonds. A construction fund is also to be set up in banks recommended by the commissioner. The amounts which are to be de-

·posited in these funds, and the use to which they are· to be put is controlled by an elaborate contractual schedule in exhibit "A" over which the treasurer has no discretion.

He is directed to deduct each year the cost of the administration of the bond issue from the funds received by him. He is to register the bonds as to principal only, provide a $25,000 surety bond conditioned upon faithful performance of his duties, keep books of record and account, provide annual statements, and at the request of the administrative committee, purchase United States government obligations with temporarily surplus funds.

No provision is made in the contract for the appointment of a fiscal agent should the State treasurer refuse to act, an event that is not likely to occur.

Some of the duties of the treasurer under exhibit "A" arise by implication and fall within the constitutional scope of his office. Since he is the officer who will receive Federal aid funds for the State, CL 1948, § 249.1 (Stat Ann § 9.831), it will be necessary for him to pass these funds on to the proper fund, and exhibit "A" can properly direct him to do so. PA 1950, No 22, § 11, *supra*,* directs ·the participating units to pay their quarterly contributions to the governmental unit issuing the bonds. The bonds under the terms of exhibit "A" are issued by the State highway commissioner, and since the treasurer is the fiscal officer for the State, section 11 might fairly be construed as directing the State treasurer for purposes of safety and economy to receive and distribute the quarterly payments from the participating units. Finally, PA 1950, No 22, *supra,* provides that these pledges shall be a first lien on funds in the State highway fund, which

* Adding CL 1948, § 252.61 (Stat Ann 1949 Cum Supp § 9.1094 [11]).—REPORTER.

is a sufficient authorization for the default provisions.

However, as to the balance of the duties under exhibit "A", there is no express statutory obligation upon the State treasurer, and in the event that he refuses to act as fiscal agent, he cannot be forced to do so. To this extent the defendant is correct.

But this does not in any way affect the validity of the bond issue. The State treasurer has no discretion in performance of his tasks under exhibit "A"; and, although it is recognized that he would be a most covenient fiscal agent, there are many financial institutions which would be satisfactory in that capacity, and would be acceptable to the parties to exhibit "A", and to the bondholders. The defect in exhibit "A" is a matter of form only, for in the event that the State treasurer does not accept his duties under exhibit "A", the 3 participating units could easily choose another fiscal agent. They could not refuse to do so, for we would not allow any impairment of the bondholders' security for the lack of an administrative officer.

There being no legal reason for his refusal to sign exhibit "A", as required by law, the defendant is directed to do so, and a writ of mandamus will issue. No costs, a public question being involved.

REID, C. J., and NORTH, DETHMERS, CARR, BUSHNELL, and SHARPE, JJ., concurred with BUTZEL, J.

BOYLES, J. *(concurring).* I concur in the result except to holding that the pledge is irrevocable.