# EMPLOYEES' RETIREMENT SYSTEM OF THE STATE OF HAWAII *v.* RAYMOND Y. C. HO, DIRECTOR OF BUDGET, STATE OF HAWAII.

## No. 4178.

MARCH 25, 1960.

TSUKIYAMA, C. J., MARUMOTO, CASSIDY, WIRTZ AND LEWIS, JJ.

OPINION BY MARUMOTO, J., IN WHICH WIRTZ, J., JOINS.

Employees' Retirement System of the State of Hawaii, plaintiff, and Raymond Y. C. Ho, Director of Budget,

State of Hawaii, defendant, are parties to a question in difference and have submitted the question to this court on agreed facts under R.L.H. 1955, c. 227.

Plaintiff is a public agency, having the powers and privileges of a corporation, and is the holder of $29,000 of general obligation bonds issued by the Territory of Hawaii. Defendant is the State officer who, with the approval of the governor, is authorized to issue general obligation bonds.

The question in difference is whether defendant may legally issue $11,000,000 of general obligation bonds, of which $6,000,000 was authorized by Act 22, and $5,000,000 was authorized by Act 23, First Special Session, First Legislature, State of Hawaii. The governor has approved the issuance of such bonds, and defendant will issue them, unless this court orders otherwise.

Plaintiffs' position is that defendant cannot legally issue such bonds because the authorizations contained in Acts 22 and 23 violate article VI, section 3, paragraph 2, of the State constitution, and that the issuance of the bonds under such defective authorizations will jeopardize the security of the bonds that it holds. The mentioned constitutional provision reads as follows:

"Sixty million dollars is established as the limit of the funded debt of the State at any time outstanding and unpaid. Bonds and other instruments of indebtedness in excess of such limit may be issued when authorized by a two-thirds vote of all the members to which each house of the legislature is entitled, provided such excess debt, at the time of authorization, would not cause the total of state indebtedness to exceed a sum equal to fifteen percent of the total of assessed values for tax rate purposes of real property in the State, as determined by the last tax assessment rolls pursuant to law."

Defendant's position is diametrically opposed to that of plaintiff. Thus, an actual controversy exists between the parties.

The question in difference is such that it might be the subject of an action in a circuit court for a declaratory judgment under R.L.H. 1955, c. 228. The submission is a proper one under R.L.H. 1955, c. 227, and we have jurisdiction.

At the time of the enactment of Acts 22 and 23, the situation of the State regarding its bonded indebtedness was as follows:

1. The total of the assessed values for tax rate purposes of real property in the State, as determined by the last tax assessment rolls pursuant to law (hereafter referred to as "assessed values") was $1,152,397,810, fifteen percent of which was $172,859,671.

2. The following bonds issued by the Territory were outstanding and unpaid:

    (a)   General obligation bonds in the sum of $115,262,000. These bonds will hereafter be referred to as "outstanding Territorial general obligation bonds."

    (b)   Highway revenue bonds in the sum of $49,225,000. These bonds were issued under R.L.H. 1955, § 137-80, and P.L. 716, Eighty-fourth Congress, Second Session, and will hereafter be referred to as "highway revenue bonds."

    (c)   Aviation revenue bonds in the sum of $14,000,000. These bonds were issued under R.L.H. 1955, § 137-94, and P.L. 85-534, Eighty-fifth Congress, Second Session, and will hereafter be referred to as "aviation revenue bonds."

3. There were also outstanding authorizations for the issuance of general obligation bonds contained in several and separate acts of the Territorial legislature (hereafter

referred to as "Territorial general obligation bond author-izations") in the total amount of $58,494,753.

Plaintiff contends that the State debt at the time of the enactment of Acts 22 and 23 included the outstanding Territorial general obligation bonds, highway revenue bonds, aviation revenue bonds, and Territorial general obligation bond authorizations. If such contention were valid, the State debt would have amounted to $236,981,753, or $64,122,082 in excess of fifteen percent of the assessed values, and the legislature would have been precluded from lawfully enacting any legislation authorizing the issuance of any additional general obligation bonds.

Defendant, on the other hand, contends that the State debt at the time of the enactment of Acts 22 and 23 con-sisted only of the outstanding Territorial general obliga-tion bonds and that none of the other items should be included as a part of such debt. Under such contention, there would have been the difference between $172,859,671 and $115,262,000, or $57,597,671, as a margin for the is-suance of additional bonds within the State debt limit, and the legislature could lawfully have authorized the issuance of additional general obligation bonds up to $57,597,671, by a two-thirds vote of all the members of each house.

In this opinion, the terms "State debt" and "Terri-torial debt" will be used frequently. So, here at the outset, we shall state the sense in which the terms will be used. They will not be used as including every type of indebted-ness of the State or of the Territory. The term "State debt" will be used as including only the types of indebted-ness which are required to be included in the computation to determine whether the total of the State indebtedness is within the debt limit prescribed in article VI, section 3, paragraph 2 and the term "Territorial debt" will be used as including only the types of indebtedness which were

required to be included in the computation to determine whether the total of the Territorial indebtedness was within the debt limit prescribed in section 55 of the Hawaiian Organic Act and amendments thereto.

The question in difference has arisen because the fiscal situation of the State at the time of the enactment of Acts 22 and 23 differed considerably from the fiscal situation of the Territory on December 31, 1949, and contained elements which were not within the contemplation of the constitutional convention. The convention based its deliberations on the information that it had regarding the fiscal situation of the Territory on December 31, 1949. *Constitutional Convention of Hawaii, Standing Committee Report No. 51, Exhibit 3.*

The following table shows a comparison of the fiscal situation of the Territory on December 31, 1949, with the fiscal situation of the State at the time of the enactment of Acts 22 and 23:

|  | Fiscal situation of Territory December 31, 1949 | Fiscal situation of State when Acts 22 & 23 were enacted |
|---|---|---|
| Outstanding Territorial general obligation bonds | $ 14,936,000 | $ 115,262,000 |
| Outstanding highway revenue bonds | None | 49,225,000 |
| Outstanding aviation revenue bonds | None | 14,000,000 |
| Total of outstanding bonds | $ 14,936,000 | $ 178,487,000 |
| Territorial general obligation bond authorizations | $ 41,076,220 | $ 58,494,753 |

Assessed values ....$333,643,899       $1,152,397,810
Fifteen percent of
   assessed values ..$ 50,046,585       $ 172,859,671

The question in difference revolves around article VI, section 3, paragraph 2. Consequently, we shall examine it to see what it means.

In the construction of a constitutional provision, the rule is well established that the words of the constitution are presumed to be used in their natural sense.

The rule was well stated by Chief Justice Marshall, in *Gibbons* v. *Ogden,* 9 Wheat. 1, 188, as follows: "As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said. If, from the imperfection of human language, there should be serious doubts respecting the extent of any given power, it is a well settled rule, that the objects for which it was given, especially when those objects are expressed in the instrument itself, should have great influence in the construction."

Mr. Justice Story stated the rule in his *Commentaries on the Constitution of the United States,* Fourth Edition, vol. I, § 451, as follows: "* * * [E]very word employed in the Constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for com-

mon use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common-sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss."

The opening sentence of the provision establishes $60,000,000 as "the limit of the funded debt of the State at any time outstanding and unpaid." The meaning of the sentence seems clear enough from its language. But the term "funded debt" may require some discussion.

In Palgrave's Dictionary of Political Economy, 1923 Edition, it is stated: "This expression [funded debt] was originally used as a description of debt, the service of which was secured by a special fund (e.g., the produce of a certain tax). But gradually the meaning acquired by the term was that of debt raised for permanent purposes and either payable at a distant date or not repayable at any definite date."

The definition in Webster's New International Dictionary, Second Edition, Unabridged, is that funded debt is a debt converted into one "that is (as originally used) permanent or runs for a fixed, usually a considerable, period of time, and bears regular interest; existing in the form of obligations to pay interest, and in the case of bonds, the principal also, at certain fixed dates."

Black's Law Dictionary, Fourth Edition, states: "As applied to states or municipal corporations, a funded debt is one for the payment of which (interest and principal) some fund is appropriated, either specifically, or by provision made for future taxation and the *quasi* pledging in advance of the public revenue." This statement finds support in *Ketchum v. Buffalo*, 14 N.Y. 356; *People v. Carpenter*, 52 N.Y.S. 781; *Corporation for the Relief of Widows & Children of Clergymen v. City of Philadelphia*, 317 Pa. 76, 176 A. 727.

Thus, under all of the definitions quoted above, funded debt means bonded indebtedness generally, and the opening sentence, standing alone, prohibits the State from having outstanding and unpaid bonds totaling more than $60,000,000 at any time.

However, the limitation prescribed in the first sentence is not inflexible. The second sentence empowers the State to issue bonds in excess of such limit of $60,000,000, when authorized by a two-thirds vote of the members of each house of the State legislature, "provided such excess debt, at the time of authorization, would not cause the total of state indebtedness to exceed" fifteen percent of the assessed values.

There may be some question as to the meaning of the proviso in the second sentence. The significance of the proviso may be understood if reference is had to a rather common practice of the Territorial legislature. The organic act placed a limitation on the amount of the outstanding Territorial debt, but did not limit the amounts of the loans that the legislature might authorize. This situation permitted the practice of stacking excess authorizations. By that, we mean that it led the Territorial legislature to enact legislation containing authorizations for the issuance of bonds in excess of the Territorial debt limit, with the result that the authorized bonds beyond the debt limit were kept waiting in line, unissued until either the debt limit was liberalized by a subsequent Congressional act or a margin for the issuance of additional bonds was created by a reduction in the amount of the outstanding bonds. We think that the proviso was intended to prevent such stacking.

As we construe the proviso, the validity of an act of the State legislature, passed by a two-thirds vote of the members of each house and containing an authorization to issue bonds which will be included in the State debt upon

issuance, is determined as follows: First, ascertain the amount of the State debt limit at the time of the enactment of such act; second, ascertain the amount of the State debt on the same date; third, ascertain the amount, as of the same date, of the bonds that are authorized to be issued under the acts then in force and which will be included in the State debt upon issuance; the act is valid if the amount of the bonds that it authorizes does not exceed the difference between the first item and the total of the second and the third items. Otherwise, it is invalid. Under the view held by three members of this court, the third item includes only the amount of the unissued bonds authorized by the State legislature and which, upon issuance, will be included in the State debt; under our view, the third item includes the amount of the unissued bonds authorized by the State legislature and also includes the amount of the unissued bonds authorized by the Territorial legislature and which the State may issue under article XVI, section 4, as we shall explain later in this opinion.

The reason for the inclusion in the constitution of a provision prescribing both a fixed dollar limit and a percentage limit on the total amount of the State debt appears in the following statement of the Committee on Taxation and Finance of the Constitutional Convention: "Your Committee has considered the various methods used in establishing debt limits and is of the firm opinion (1) there should be a fixed dollar amount which will provide for a definite limit to apply at the time that the Constitution goes into effect, and (2) that flexibility should be provided for by permitting this limit to be increased by an extraordinary vote of the legislature * * * as economic conditions change." *Constitutional Convention of Hawaii, Standing Committee Report No. 51.*

Thus, the language of article VI, section 3, paragraph

2, taken in its natural sense, prohibits the State from having outstanding bonds and authorizations to issue bonds which add up, at any time, to more than fifteen percent of the assessed values.

Our next problem is to determine the types of bonds which are required to be counted as parts of the State debt in the computation to determine whether the total amount of the outstanding and unpaid State debt is within the State debt limit.

There is no question that the convention contemplated that all general obligation bonds would constitute a part of the State debt. The Committee on Taxation and Finance stated that it was with general obligation bonds "that the section on debt limits is primarily concerned." *Constitutional Convention of Hawaii, Standing Committee Report No. 51.*

At the time of Hawaii's admission into the Union (hereafter, Hawaii's admission into the Union will be referred to simply as "admission"), the Territory had $116,997,000 of general obligation bonds outstanding and unpaid. That figure was $56,997,000 in excess of the State debt limit of $60,000,000, which the convention intended to be applicable at the time of admission. However, article XVI, section 3, provided:

"The debts and liabilities of the Territory shall be assumed and paid by the State, * * *."

That provision did not place any limitation on the amount of the debts and liabilities that the State was required to assume and pay. We think that the provision was self-executing, and operated to turn all of the Territorial general obligation bonds, which were outstanding and unpaid at the time of admission, into State obligations and constituted them a part of the State debt, without any formal action on the part of the State. Some of the bonds, which thus became State obligations, were paid

subsequent to admission, so that at the time of the enactment of Acts 22 and 23, the outstanding and unpaid balance of such bonds was $115,262,000, the figure set forth in paragraph III-B of the submission.

Defendant appears to be in accord with our interpretation of the meaning and effect of article XVI, section 3, for it is stated in the submission: "Defendant admits that the general obligation bonds set out in paragraph III-B should be counted toward the funded debt of the State." We construe the admission to mean that such bonds should be counted as constituting a part of the State debt.

The Committee of the Whole of the Constitutional Convention considered that article XVI, section 3, was surplusage. It stated in Report No. 26: "The Committee was of the opinion that this section was surplusage, in view of the broader provisions in Committee Proposal No. 23, but felt that since the [United States] Senate had expressly required such a provision in H.R. 49 [Hawaii statehood bill in Congress], we should literally comply with such requirement, particularly since it relates largely to bonds."

The broader provision of Committee Proposal No. 23, to which the committee undoubtedly had reference, was the provision that was included in article XVI, section 2, paragraph 2, reading as follows:

"Except as otherwise provided by this constitution, all existing * * * contracts, claims, demands, * * * and rights shall continue unaffected notwithstanding the taking effect of this constitution, except that the State shall be the legal successor to the Territory in respect thereof, * * *."

Article XVI, section 3, might have appeared to be surplusage at the time of the convention, when the amount of the outstanding Territorial general obligation bonds was well below the initial State debt limit of $60,000,000

prescribed in the first sentence of article VI, section 3, paragraph 2, for such situation would have been fully covered by article XVI, section 2, paragraph 2. It certainly was not surplusage at the time of admission when the amount of the outstanding Territorial general obligation bonds was $116,997,000. In such a situation, an argument might have been made that article XVI, section 3, was subject to article VI, section 3, paragraph 2. Thus, if reliance were had solely on article XVI, section 2, paragraph 2, it might have been argued that the phrase, "except as otherwise provided by this constitution," had the effect of preventing $56,997,000 of the bonds over such limit of $60,000,000 from becoming State obligations without formal action on the part of the State.

Two members of this court are strongly of the conviction that under article VI, section 3, paragraph 2, the State debt consists only of general obligation bonds, that the highway revenue bonds and the aviation revenue bonds were not general obligations of the Territory, and that, consequently, such bonds did not become a part of the State debt. That brings up for our consideration the status of the highway revenue bonds and the aviation revenue bonds in the pattern of article VI, section 3, paragraph 2. We shall first consider the highway revenue bonds.

The highway revenue bonds are bonds of a unique type which did not exist at the time of the convention. Their issuance was authorized by S.L.H. 1955, c. 249, s. 1, compiled in R.L.H. 1955, § 137-80, and P.L. 716, Eighty-fourth Congress, Second Session. P.L. 716 became law on July 14, 1956. So, these bonds did not see daylight until six years after the convention. They were issued by the Territory under the general control and supervision of the superintendent of public works "for the design, construction, reconstruction, repair and maintenance of, and for

engineering and acquisition of rights of way for, highways in the Territory on which federal aid moneys are expendable or have been expended." They were not general obligations of the Territory, and are payable only from the proceeds of highway vehicle fuel taxes. No holder of such bonds has the right to compel any exercise of the taxing power of the Territory for their payment, except with respect to highway vehicle fuel taxes which secure their payment under the following provision of R.L.H. 1955, § 137-82: "To the extent required by any resolution of issuance, the proceeds of such taxes remaining in the territorial highway fund after the payments required by paragraph (a) of section 129-12 are hereby irrevocably pledged to the payment of any highway revenue bonds issued and of the interest thereon. This pledge shall take effect upon the first date of issuance of any such bonds and, so long as any such bonds are outstanding, shall continue to apply to the Territorial highway fund or such other fund as may be constituted for the deposit of highway vehicle fuel taxes under the control of the superintendent of public works. The legislature hereby agrees to continue to impose such taxes on highway vehicle fuels in amounts at least sufficient to provide, as the resolution of issuance may require, for the payment of the principal of all highway revenue bonds and the interest thereon, as such principal and interest become due." In approving the issuance of these bonds, Congress declared in P.L. 716 that they "shall not constitute the incurrence of an indebtedness within the meaning of the Hawaiian Organic Act."

A study of the proceedings of the convention, the committee reports, and the language of the various paragraphs of article VI, section 3, indicates that the convention considered the following types of indebtedness:

1.  General obligation bonds "which are paid for from general revenues and the proceeds of which are

used to develop the capital improvements or activities considered purely governmental";

2. Instruments of indebtedness to meet appropriations for any fiscal period in anticipation of the collection of revenues for such period to meet casual deficits or failures of revenue, which shall be payable within one year;

3. Bonds and other instruments of indebtedness to suppress insurrection, to repel invasion, to defend the State in war, or to meet emergencies caused by disaster or act of God;

4. Revenue bonds of a public enterprise of the State or political subdivision, or of a public corporation, secured by the revenues of such enterprise or public corporation; and

5. Improvement district bonds secured by the properties benefited or improved or the assessments thereon.

With reference to the types of indebtedness mentioned in items 2 and 3, article VI, section 3, paragraph 3, provides:

"Instruments of indebtedness to meet appropriations for any fiscal period in anticipation of the collection of revenues for such period or to meet casual deficits or failures of revenue, which shall be payable within one year, and bonds or other instruments of indebtedness to suppress insurrection, to repel invasion, to defend the State in war or to meet emergencies caused by disaster or act of God, may be issued by the State under legislative authorization without regard to any debt limit."

The types of indebtedness mentioned in items 4 and 5 are excluded from being counted as parts of the State debt by article VI, section 3, paragraph 7, which reads:

"The provisions of this section shall not be appli-

cable to indebtedness incurred under revenue bond statutes by a public enterprise of the State or political subdivision, or by a public corporation, when the only security for such indebtedness is the revenues of such enterprise or public corporation, or to indebtedness incurred under special improvement statutes when the only security for such indebtedness is the properties benefited or improved or the assessments thereon."

There is no provision in the constitution which specifically mentions general obligation bonds. But article VI, section 3, paragraph 6, provides, in part:

"Interest and principal payments shall be a first charge on the general revenues of the State or political subdivision, as the case may be."

The proponents of the proposition that the State debt consists only of general obligation bonds base their stand on this provision. They reach their conclusion, as we understand it, by the following process of reasoning: that only the bonds that constitute a first charge on the general revenues of the State are included in the meaning of the term "funded debt" as used in article VI, section 3, paragraph 2; that general obligation bonds are the only type of bonds that constitute a charge on the general revenues of the State; that, consequently, the term "funded debt" means general obligation bonds only.

We see these difficulties in such argument: first, it ignores the meaning of the term "funded debt" in its natural sense; second, it renders article VI, section 3, paragraph 7, meaningless; and, third, it misapplies article VI, section 3, paragraph 6.

If the convention intended that only general obligation bonds be included in the State debt, and that general obligation bonds issued for certain purposes be excluded from the State debt, it could easily have expressed such intention unequivocally, as Congress did in connection with

the act approving the issuance of general obligation bonds to make and purchase mortgages on homes and farms of veterans in Hawaii under S.L.H. 1953, c. 211, which we shall hereafter refer to as "veterans' mortgage bonds." In P.L. 85-691, Eighty-fifth Congress, Second Session, Congress provided: "That in applying the Territory's debt limitation, the computation of the amount to which the total indebtedness of the Territory may be extended at any time shall include all general obligation bonds, but shall not include the general obligation bonds to be issued pursuant to this Act."

Instead, the convention used the generic term "funded debt" to denote the types of indebtedness that comprise the State debt. We have already noted that, in its natural sense, the term means bonded indebtedness generally. We must presume that the convention used such general term with a purpose. A constitution is a document which is intended to last a long time. So, it must be tensile and must have "a little play in its joints." Holmes, J., in *Bain Peanut Co.* v. *Pinson*, 282 U.S. 499, 501. Nowhere is Mr. Justice Cardozo's statement that "There is an accuracy that defeats itself by the overemphasis of details" more cogently applicable than in a constitution. Cardozo, *Law and Literature*, p. 7. The Committee on Taxation and Finance stated that it was with general obligation bonds that "the section on debt limits is *primarily* concerned." (Emphasis supplied.) Such statement indicates that the convention did not consider that the State debt was comprised *exclusively* of general obligation bonds.

Also, if the convention intended that only general obligation bonds be included in the State debt, article VI, section 3, paragraph 7, would not have been necessary. The bonds mentioned in the provision do not constitute a charge on the general revenues of the State and are definitely not general obligation bonds. A provision to ex-

clude bonds that are not general obligation bonds from the State debt has no meaning at all if the State debt is comprised of general obligation bonds only.

Article VI, section 3, paragraph 6, in its entirety, reads as follows:

"All bonds or other instruments of indebtedness for a term exceeding one year shall be in serial form maturing in substantially equal annual installments, the first installment to mature not later than five years from the date of the issue of such series, and the last installment not later than thirty-five years from the date of such issue. Interest and principal payments shall be a first charge on the general revenues of the State or political subdivision, as the case may be."

This provision is prospective in its operation, and we think that it is applicable only to the bonds issued by the State under the authorizations of the State legislature, and has no application to the bonds inherited by the State from the Territory. We have no evidence as to whether the bonds inherited by the State from the Territory conformed to the requirement stated in the first sentence of the provision. It certainly cannot be said that such bonds, or some of them, which might not be in conformity with such requirement, did not become a part of the State debt by reason of such non-compliance.

We may reasonably assume that the convention did not give any consideration to highway revenue bonds. The records of the convention do not show that there was any discussion on the subject.

So, here we have a situation which the convention did not have in mind and for which it did not make any specific provision. In such a situation, the following words of Mr. Justice Stone, in *United States* v. *Classic,* 313 U.S. 299, 316, provide a beacon: "But in determining whether a provision of the Constitution applies to a new subject matter,

it is of little significance that it is one with which the framers were not familiar. For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, these fundamental purposes which the instrument itself discloses. Hence we read its words, not as we read legislative codes which are subject to continuous revision with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government. * * * If we remember that 'it is a Constitution we are expounding,' we cannot rightly prefer, of possible meanings of its words, that which will defeat rather than effectuate the constitutional purpose."

We see no justification for excluding the highway revenue bonds from the State debt. The literal meaning of the term "funded debt" includes such bonds. The constitutional purpose of article VI, section 3, paragraph 2, enjoins us to include such bonds in the State debt.

In connection with the State debt limit, the convention was principally concerned with the maintenance of the credit of the State and the ability of the State to market its bonds at reasonable rates of interest. It was of the firm view that a debt limit in excess of fifteen percent of the assessed values would impair the credit of the State and the marketability of its bonds at reasonable rates of interest. It excluded from the State debt the types of bonds which were self-liquidating and did not have any impact on the credit of the State.

The highway revenue bonds, like general obligation bonds, were issued to finance an activity which is purely governmental. They depend for their payment on the exercise of the taxing power of the State.

On June 30, 1950, when the convention was in session, there were outstanding and unpaid general obligation

bonds issued for highway purposes under S.L.H. 1947, c. 73, in the amount of $3,000,000, and there was also an outstanding authorization for the issuance of such bonds under the same act in the amount of $2,850,000. Although such bonds were general obligation bonds, they were payable from the Territorial highway fund, a special fund created under R.L.H. 1945, § 5260, into which the taxes collected under the Hawaiian Fuel Tax Act, R.L.H. 1945, c. 100, were deposited. The convention treated such bonds and authorizations like other outstanding general obligation bonds and authorizations to issue general obligation bonds, and did not provide for their exclusion from the State debt merely because they were paid from a special fund.

Under S.L.H. 1947, c. 73, as amended by S.L.H. 1951, c. 111, general obligation bonds in the amount of $8,100,000 were issued for highway purposes. The outstanding Territorial general obligation bonds of $116,997,000 that the State inherited upon admission included the outstanding and unpaid balance of such bonds issued for highway purposes. Before admission, the general obligation bonds issued for highway purposes were paid from the Territorial highway fund; after admission they are being paid from the State highway fund.

The impact of the highway revenue bonds and the general obligation bonds issued for highway purposes upon the credit of the State appears to be similar. Both require the exercise of the taxing power of the State for their payment, both are paid from the State highway fund, and both constitute a drain on the tax revenues of the State.

The highway revenue bonds were issued to finance an accelerated highway improvement program urgently needed to meet the Territory's rapidly expanding traffic requirements and to place the Territory in a better position to match the increased allocations of Federal funds

under the Federal Aid Highway Act of 1954 and other anticipated Federal legislation. Congress made the issuance of these bonds possible, without regard to the Territorial debt limit, by declaring in P.L. 716, Eighty-fourth Congress, Second Session, that their issuance did not constitute the incurrence of an indebtedness within the meaning of the organic act. Nothing in the history of P.L. 716 shows that these bonds were excepted from the Territorial debt limit because they were intrinsically of such a nature as to have no effect on the credit of the State. It appears that Congress excepted them because the needs of the Territory were urgent and it had the plenary power to except them.

There is no provision in the constitution which excludes from the State debt certain bonds inherited from the Territory merely because they did not constitute a part of the Territorial debt. The constitution determines which bonds are to be included in the State debt. For the purpose of such determination, the status of the bonds under the organic act or other acts of Congress is immaterial.

Defendant contends that the highway revenue bonds are excluded from the State debt under article VI, section 3, paragraph 7.

The argument is that the construction and maintenance of highways constitute a public enterprise of the State and that the proceeds of highway vehicle fuel taxes deposited in the State highway fund, which secure such bonds, are revenues of such enterprise.

We see no necessity for stating our view as to whether the construction and maintenance of highways may be considered a public enterprise of the State, for it is too far-fetched to characterize the revenues derived from the exercise of the taxing power of the State and allocated to the operation of a governmental activity as revenues of an enterprise.

The language of article VI, section 3, paragraph 7, as well as the reports of the Committee on Taxation and Finance and the Committee of the Whole, clearly indicate the types of bonds intended to be covered by the provision. According to the Committee on Taxation and Finance, the provision covers "Revenue bonds issued by and against particular activities that are expected to pay their own cost of operation—e.g., water bonds, bonds for the development of harbors, airports, etc." According to the Committee of the Whole, the provision covers "bonds such as those which might be issued by a local redevelopment agency under the Urban Redevelopment Act or similar legislation." The bonds referred to by the Committee on Taxation and Finance and the Committee of the Whole are bonds that may be issued either under R.L.H. 1955, c. 137, pt. III, or R.L.H. 1955, c. 140, and depend for their payment solely upon the revenue producing potential of the undertakings for which they are issued, and are not like the highway revenue bonds, which depend for their payment on the exercise of the taxing power of the State.

Aviation revenue bonds were issued by the Territory under the general control and supervision of the Hawaii Aeronautics Commission "for the construction, operation and maintenance of airports and air navigation facilities, including acquisition of real property and interests therein," and were payable from the proceeds of aviation fuel taxes and revenues of the commission, including rents, fees and other charges. Like the highway revenue bonds, they were not general obligations of the Territory. Also, like the highway revenue bonds, they are dependent for their payment upon the exercise of the taxing power of the State in imposing and collecting aviation fuel taxes. They differ from the highway revenue bonds in that they are additionally secured by the revenues of the commission, including rents, fees and other charges. This feature

makes these bonds look somewhat like the revenue bonds mentioned in article VI, section 3, paragraph 7, but is insufficient to take them out of the State debt, for, in order to come under that provision, the revenues of the enterprise must be the *only* security for the bonds.

One final statement may be made about our position with reference to the highway revenue bonds and the aviation revenue bonds. Professor Powell makes the suggestion that "it is at least arguable that in construing a constitution, one is not restricted to what the framers thereof thought they were saying, nor even to what *they* would *then* have said, if the present problem had been suggested to them for decision, but rather that one should ask what would men of the present, having a caliber and interest in public weal comparable to these framers, *now* say upon the problem now faced." Powell, *Construction of Written Instruments,* 14 Indiana Law Journal, 199, 207.

Professor Powell acknowledges that his statement is rather broad and goes beyond the current status of the law with respect to constitutional interpretation. The point that we wish to make is that even if such statement accurately states the law at this time, we will arrive at the same conclusion.

As late as August 1958, just one year before admission, after it had decided to approve the issuance of the highway revenue bonds and the aviation revenue bonds as exceptions to the debt limit prescribed in the organic act by using the formula that the issuance of such bonds did not constitute the incurrence of an indebtedness within the meaning of the organic act, Congress refused to increase the debt limit prescribed in the organic act from ten percent to fifteen percent of the assessed values, but took care of the immediate fiscal needs of the Territory in P.L. 85-691, Eighty-fifth Congress, Second Session, by using another formula which we previously mentioned, namely,

"That in applying the Territory's debt limitation, the computation of the amount to which the total indebtedness of the Territory may be extended at any time shall include all general obligation bonds, but shall not include the general obligation bonds to be issued pursuant to this Act." In refusing to increase the debt limit prescribed in the organic act, Congress followed the recommendation of the Interior Department. The recommendation of the Interior Department was set forth in the communication to the Chairman, Committee on Interior and Insular Affairs, House of Representatives, pertinent portions of which were as follows:

"We are opposed to the enactment of H.R. 9499. However, we recommend that H.R. 11954 be enacted, if amended in the manner suggested herein. * * *
"* * *

"The purpose of H.R. 9499 is to increase the debt limitation for bonds issued by the Territorial government from 10 to 15 percent of the assessed value of property. * * *

"We consider it very necessary that action be taken to permit additional bonding by the Territory at this time. However, we do not consider it advisable to increase the ceiling from the present level of 10 percent. Instead, we favor the alternative approach toward making additional bonding capacity available to the Territory, as set forth in H.R. 11954 and in the attached substitute.

"With respect to the proposed increase in ceiling, from 10 to 15 percent of assessed valuation, a Territorial advisory committee on government financing has just completed a study of its probable effect upon the credit of the Territorial government and the marketability of its bonds. On the basis of this study, the committee has reported to Governor Quinn that 10

percent is the practical, as well as the legal, limit on issuance of bonds, because of market attitudes among bond dealers and investors that would be encountered if that limit were departed from. That committee has further advised that the mere raising of the statutory limit would be disadvantageous to the market standing of Territorial issues.

"H.R. 11954 provides, as an alternative, that there be excluded from the computation of issues governed by the 10-percent maximum, the veterans' home mortgage bonds issued pursuant to act 211 of the 1953 Territorial legislature * * *. Of the $20 million in bonds authorized by that act, $16,900,000 is outstanding. Although this bond issue is entirely self-supporting, it is charged against the Territorial debt limit. We believe that exclusion of these bonds from the debt limit would in no way impair marketability of Territorial bonds. At the same time, that action would permit additional Territorial borrowing in the amount of over $16 million. Such a change would take care of the Territory's immediate needs." *U.S. Code Congressional and Administrative News,* 85th Congress, Second Session, 1958, pp. 3663-3664.

If the argument of the proponents of the proposition that only general obligation bonds should be included in the State debt were followed, the State could have issued, at the time of admission, additional general obligation bonds of $55,862,671, the difference between the State debt limit of $172,859,671 and the outstanding general obligation bonds of $116,997,000. In such event, the State could have had at the time of admission total bonded indebtedness of $236,084,671, as follows:

| | |
|---|---|
| Outstanding general obligation bonds | $116,997,000 |
| Outstanding highway revenue bonds | 49,225,000 |
| Outstanding aviation revenue bonds | 14,000,000 |

Additional general obligation
bonds issuable under authorizations
of State legislature............................. 55,862,671

Total ..............................................$236,084,671

Such sum of $236,084,671 would have been 20.5 percent
of the assessed values of $1,152,397,810. We do not think
that such result accords with the intention of the conven-
tion, nor does it accord with the intention of Congress
expressed exactly a year before admission.

We hold that both the highway revenue bonds and the
aviation revenue bonds should be included in the State
debt.

The outstanding Territorial general obligation bonds,
the highway revenue bonds and the aviation revenue bonds
added up to $178,487,000 at the time of the enactment of
Acts 22 and 23. Such total was $5,627,329 in excess of
the applicable State debt limit of $172,859,671. Con-
sequently, Acts 22 and 23 are invalid, and none of the
bonds mentioned in those acts may be issued under the
authorizations contained in those acts.

However, we think that most of the projects for which
bonds were authorized by Acts 22 and 23 may be under-
taken by the issuance of bonds under the authorizations
contained in the following acts of the Territorial legis-
lature which make up the Territorial general obligation
bond authorizations of $58,494,753:

| | | |
|---|---|---:|
| S.L.H. 1947 | Act 205.....................$ | 1 |
| S.L.H. 1949 | Act 401........................ | 64,900 |
| S.L.H. (Sp.) 1949 | Act 55........................ | 157,000 |
| S.L.H. 1953 | Act 211........................ | 110,000 |
| S.L.H. 1953 | Act 280........................ | 1,517,976 |
| S.L.H. 1955 | Act 273........................ | 9,614,199 |
| S.L.H. 1957 | Act 150........................ | 20,206,152 |
| S.L.H. 1959 | Act 224........................ | 26,824,525 |
| | | $58,494,753 |

We think that the mentioned acts were continued in force after admission by the plain words of article XVI, section 4, which provided:

"All acts of the legislature of the Territory authorizing the issuance of bonds by the Territory or its political subdivisions are approved, subject, however, to amendment or repeal by the legislature, and bonds may be issued by the State and its political subdivisions pursuant to said acts. Whenever in said acts the approval of the President or of the Congress is required, the approval of the governor shall suffice."

Article XVI, section 4, has an importance which is not readily apparent on casual reading. The literal meaning of the provision is clear. The first sentence does these three things: (1) it continues in force all acts of the Territorial legislature authorizing the issuance of bonds by the Territory or its political subdivisions; (2) it permits the State legislature to amend or repeal the acts so continued in force; and (3) it empowers the State and its political subdivisions to issue bonds "pursuant to said acts." The second sentence provides a substitute procedure to satisfy the provisions in the Territorial acts requiring Presidential or Congressional approval as a prerequisite to the issuance of bonds.

In other words, what article XVI, section 4, does is to continue in force the acts of the Territorial legislature authorizing the issuance of bonds as though admission had not taken place, with these two necessary changes: first, the State is substituted for the Territory, and, second, the approval of the governor is substituted for Presidential or Congressional approval. It places the State in the same position as the Territory with respect to such acts, and empowers the State to do exactly the same things to, and exactly the same thing under, such acts as the Territory could have done, no more, no less.

Thus, before admission, the Territorial legislature could have amended or repealed such acts. So, after admission, under article XVI, section 4, the State may amend or repeal such acts. Also, before admission, the Territory could have issued the bonds authorized in such acts, subject to the special limitations, if any, contained in such acts and to the limitations contained in the organic act and other Congressional acts. So, after admission, the State may issue the bonds authorized by such acts, subject to the same limitations that applied to the Territory.

Most of the mentioned acts contained some special limitations regarding the issuance of the authorized bonds. All of such acts contained the general limitation that the authorized bonds be issued "as provided by law." The quoted phrase required that the authorized bonds be issued subject to the Territorial debt limit prescribed in the organic act, as amended by subsequent Congressional acts.

At the time of admission, the applicable Territorial debt limit was the limit provided in P.L. 85-691, Eighty-fifth Congress, Second Session, approved August 20, 1958. The limit was ten percent of the assessed values, exclusive of veterans' mortgage bonds.

Also, at the time of admission, the assessed values were $1,152,397,810, ten percent of which was $115,239,781; the amount of the outstanding Territorial general obligation bonds was $116,997,000, including $19,362,230 of veterans' mortgage bonds; and the amount of the Territorial general obligation bond authorizations was $58,494,753, including $110,000 of authorization to issue veterans' mortgage bonds.

Inasmuch as P.L. 85-691 excluded veterans' mortgage bonds from the Territorial debt, out of the outstanding Territorial general obligation bonds of $116,997,000 mentioned in the preceding paragraph, only $97,634,770, the difference between $116,997,000 and $19,362,230, consti-

tuted the Territorial debt. That would have permitted the Territory, immediately before admission, to issue, under the mentioned acts, other than S.L.H. 1953, c. 211, additional general obligation bonds of $17,605,011, the difference between the Territorial debt limit of $115,239,781 and $97,634,770. Also, in addition to such bonds of $17,605,011, the Territory could have issued $110,000 of veterans' mortgage bonds under S.L.H. 1953, c. 211.

If effect were given to the literal meaning of article XVI, section 4, inasmuch as it placed the State in the same position as the Territory with respect to the Territorial general obligation bond authorizations, the State, immediately after admission, like the Territory immediately before admission, could have issued $17,605,011 of general obligation bonds under the authorizations contained in the mentioned acts, other than S.L.H. 1953, c. 211, and also $110,000 of veterans' mortgage bonds under S.L.H. 1953, c. 211.

We do not think that the authority of the State to issue such bonds lapsed by reason of its failure to issue the authorized bonds immediately upon admission. We think that the State may still issue the bonds that the Territory could have issued immediately before admission. The bonds so issued will be part of the State debt.

Three members of this court are of the opinion that the State cannot issue any bonds under the Territorial general obligation bond authorizations which were outstanding at the time of admission. Our understanding of their position is that article XVI, section 4, is subject to article VI, section 3, paragraph 2, although it is not expressly so stated in the constitution; that under article VI, section 3, paragraph 2, the limit of the funded debt of the State outstanding and unpaid at any time is fixed at $60,000,000; that such limit may be exceeded by a two-thirds vote of the members of each house of the State

legislature; that the outstanding and unpaid funded debt that the State inherited from the Territory at the time of admission was $116,997,000, if only general obligation bonds were counted, and was $180,222,000, if the highway revenue bonds and the aviation revenue bonds were counted in addition to general obligation bonds; that article XVI, section 4, continued the Territorial acts in force, but, because of the limitation prescribed in article VI, section 3, paragraph 2, such acts were dormant and the State could not issue any bonds thereunder either at the time of admission or at the time of the enactment of Acts 22 and 23.

Article XVI, section 4, was included in the constitution as a result of the proposal made in the Committee of the Whole in the closing days of the convention after the committee had considered the proposals which were incorporated in the constitution as article XVI, section 2, paragraph 1, and article XVI, section 3. We have already discussed article XVI, section 3, which provided for the assumption and payment by the State of the debts and liabilities of the Territory. Article XVI, section 2, paragraph 1, reads as follows:

"All laws in force at the time this constitution takes effect and not inconsistent therewith, * * * shall be the laws of the State and remain in force, mutatis mutandis, until they expire by their own limitation, or are altered or repealed by the legislature."

The committee thought that the matter stated in article XVI, section 4, was covered by article XVI, section 2, paragraph 1. However, it recommended the adoption of article XVI, section 4, because it deemed it wise to have a section dealing expressly with bonds in view of "the rigid scrutiny given to our laws by mainland bond attorneys whenever a bond issue is proposed."

Thus, article XVI, section 4, is a special provision to cover a specific matter included in the general provision

of article XVI, section 2, paragraph 1. It is a settled rule of construction "that where there is, in an act or Constitution, a specific provision relating to a particular subject, such provision will govern in respect to that subject as against general provisions in the act or Constitution, although the latter standing alone would be broad enough to include the subject to which the more particular provision relates." *City of Tulsa* v. *Southwestern Bell Telephone Co.,* 75 F. 2d 343. Under such rule, article XVI, section 4, superseded article XVI, section 2, paragraph 1, in respect to the Territorial acts authorizing the issuance of bonds.

If the convention had not included article XVI, section 4, in the constitution, article XVI, section 2, paragraph 1, would have continued the mentioned acts of the Territorial legislature authorizing the issuance of bonds, with necessary changes, but only to the extent that such acts were not inconsistent with the constitution.

In the situation that existed at the time of admission, when the amount of the outstanding Territorial general obligation bonds e x c e e d e d the initial debt limit of $60,000,000 prescribed in article VI, section 3, paragraph 2, and the total of such bonds and the other bonds, which should be included in the State debt according to our view, exceeded fifteen percent of the assessed values, the qualifying phrase "not inconsistent therewith" in article XVI, section 2, paragraph 1, would have raised the question whether any Territorial act causing the issuance of bonds not only in excess of such limit of $60,000,000 but also in excess of fifteen percent of the assessed values would have been consistent with the constitution.

Article XVI, section 4, does not contain any qualifying phrase which is similar to the phrase contained in article XVI, section 2, paragraph 1. So, unless we read such phrase into it, article XVI, section 4, continues in force

all of the Territorial acts containing authorizations to issue bonds without regard to anything that is stated in article VI, section 3, paragraph 2.

We do not think that there is justification for reading such qualifying phrase into article XVI, section 4. We must presume that the convention knew what it was doing and that it omitted such qualifying clause deliberately and for good reason. As Chief Justice Marshall said, the convention "must be understood to have employed words in their natural sense, and to have intended what they have said."

The reading of such qualifying phrase in article XVI, section 4, throws a smog of uncertainty around a provision which, without such supplementation, is clear as crystal. It was precisely to maintain the clarity so necessary for the marketing of the bonds authorized by the acts of the Territorial legislature and to eliminate all beclouding uncertainty that the convention adopted article XVI, section 4, as a "separate section dealing expressly with such territorial bond laws." We repeat the words of Mr. Justice Story as being particularly pertinent here: "Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings."

We do not think that article VI, section 3, paragraph 2, controls article XVI, section 4, assuming that there is a conflict between the two provisions. Rather, we think that it is the other way around. If there is any conflict, we think that article XVI, section 4, supersedes article VI, section 3, paragraph 2.

However, we do not think that there is a conflict be-

tween the two provisions. They deal with two different things. Article VI, section 3, paragraph 2, places a limitation on the borrowings that the State may do entirely on its own under the authorizations of its legislature. It has nothing to do with the obligations which the State must willy-nilly accept under the constitution, nor does it have anything to do with the authorizations to issue bonds that the constitution gives to the State. Article XVI, section 4, says that the State may issue the bonds authorized by the acts of the Territorial legislature "pursuant to said acts." It does not say that the issuance shall be pursuant to article VI, section 3, paragraph 2. Thus, article XVI, section 4, in effect, furnishes to the State a constitutional authorization to issue bonds, which is on a higher plane than even an authorization by a two-thirds vote of the members of each house of the State legislature.

To give effect to article XVI, section 4, according to its literal meaning will be in accord with the purpose of the provision and with Mr. Justice Stone's injunction that "If we remember 'it is a Constitution we are expounding,' we cannot rightly prefer, of possible meanings of its words, that which will defeat rather than effectuate the constitutional purpose."

Article XVI, section 4, is a transitional provision. The transitional provisions in the constitution were designed to make the transition of Hawaii from the status of a territory to that of a state as smooth as possible. We shall explain how article XVI, section 4, would have effectuated such design and purpose.

As previously stated, the Territory could have issued $17,605,011 of general obligation bonds, other than veterans' mortgage bonds, and $110,000 of veterans' mortgage bonds, immediately before admission. The Territory had sold $20,000,000 of general obligation bonds and $12,500,000 of highway revenue bonds within three months

of admission. Such sales had brought the total Territorial debt that the State was required to assume under article XVI, section 3, at the time of admission, to exceed fifteen percent of the assessed values by $7,362,329, as follows:

Outstanding Territorial
  general obligation bonds........................$116,997,000
Outstanding highway revenue bonds...........  49,225,000
Outstanding aviation revenue bonds...........  14,000,000

Total of outstanding bonds......................$180,222,000
Fifteen percent of assessed values...............  172,859,671

Excess over fifteen percent
  of assessed values...........................................$   7,362,329

Among the acts of the Territorial legislature authorizing the issuance of bonds contained in the Territorial general obligation bonds of $58,474,753, was S.L.H. 1957, c. 150.

The authorizations under S.L.H. 1957, c. 150, which had not been allocated to specific public improvements at the time of admission amounted to $20,206,152. The act provided that the "governor upon recommendation of the director of territorial planning shall determine when the authorized projects shall be initiated, taking into consideration the factors of public need, current bond market conditions, general financial condition of the Territory, and general economic conditions * * *."

We do not know why the Territory had not issued all of the bonds that it could have issued before admission. The reason might have been that the authorized projects were not urgently needed, or it might have been that, although the projects were needed, the bond market conditions or the economic conditions were unfavorable.

If the Territory had not issued the bonds for the reason that the authorized projects were not urgently needed, article XVI, section 4, does not require the State to undertake such projects. Under the provision, the State legis-

lature may repeal the Territorial acts authorizing the issuance of the bonds required to finance such projects.

On the other hand, if the Territory had not issued the bonds for the reason that the bond market conditions or the economic conditions were unfavorable, although the authorized projects were needed, our interpretation of article XVI, section 4, will permit the State to issue the bonds that the Territory could have issued when the bond market conditions and the economic conditions improved. Thus, under our interpretation of article XVI, section 4, admission will not cause the people of Hawaii to go without the necessary projects, which the Territory would have provided in due time if admission had not taken place.

The total bonded indebtedness of $180,222,000 that the State inherited from the Territory at the time of admission constituted 15.6 percent of the assessed values. The issuance of $17,715,011 ($17,605,011 plus $110,000) of additional bonds would have caused the State debt to be $197,937,011, or 17.2 percent of the assessed values.

Such a situation would have prohibited the State from authorizing the issuance of bonds during the transitional period while the outstanding and unpaid bonds that the State inherited from the Territory and the bonds that the State issued under Territorial authorizations worked themselves down to an amount below the State debt limit or the State debt limit worked itself up above the outstanding and unpaid balance of such bonds by increase in the assessed values.

However, we repeat, article XVI, section 4, does not obligate the State to issue the bonds authorized by the Territorial acts; it merely permits the State to issue such bonds, if it desires to do so and only if it desires to do so, and also only within the limitations prescribed in the Territorial debt prescribed in the organic act and other Congressional acts.

We think that our interpretation of article XVI, section 4, by thus giving the State the chance to issue such bonds and undertake the projects that the Territory could have undertaken, not only gives effect to the natural sense of the language of the provision but also effectuates the constitutional purpose of bringing about a smooth transition from the territorial form of government to that of a state.

If our interpretation of article XVI, section 4, represented the view of the majority of the members of this court with reference to that provision, then in view of the authority of the State legislature to amend the Territorial acts which were continued in force by that provision, it may conceivably be argued that Acts 22 and 23 are amendments of the mentioned acts of the Territorial legislature authorizing the issuance of bonds and are valid as such amendments. But three members of this court do not agree with our interpretation. Their position, as we previously noted, is that the State could not issue the bonds under the Territorial acts either at the time of admission or at the time of the enactment of Acts 22 and 23. In enacting Acts 22 and 23, the State legislature obviously proceeded on the same premise. It framed those acts as new authorizations under the second sentence of article VI, section 3, paragraph 2, and not as amendments of the Territorial acts under article XVI, section 4. Consequently, there is no necessity for further pursuing this inquiry.

Inasmuch as Mr. Justice Cassidy joins in our holding that the outstanding Territorial general obligation bonds, the highway revenue bonds and the aviation revenue bonds should be included in the State debt, although he does not agree with our view on the Territorial general obligation bond authorizations, judgment will be entered declaring:

1. That the authorization to issue $6,000,000 worth

of bonds found in Act 22, First Special Session 1959, First State Legislature, and the authorization to issue $5,000,000 worth of bonds found in Act 23, First Special Session 1959, First State Legislature, are unconstitutional and of no effect;

2. That the approval granted the issuance of the bonds under Acts 22 and 23 by the governor is accordingly void and of no effect; and

3. That defendant cannot legally proceed to issue, sell, and deliver the $6,000,000 and $5,000,000 bond issues pursuant to Acts 22 and 23.

*C. Nils Tavares* and *Michiro Watanabe* for plaintiff.

*Shiro Kashiwa,* Attorney General, *Harold Y. Shintaku,* Deputy Attorney General (*Henry H. Shigekane* and *Carlos Ramelb,* Deputy Attorneys General, with them on the briefs) and *George Herrington* of the firm of *Orrick, Dahlquist, Herrington & Sutcliffe,* for defendant.

---

CONCURRING OPINION OF CASSIDY, J.

The ultimate issue for decision under the submission on agreed facts in this case is whether or not Act 22 and Act 23, First Special Session, First Legislature, State of Hawaii, or either of them, can be upheld against the contention that they violate the State debt limitations of the Constitution.

The key constitutional provisions are contained in Article VI, section 3, paragraph 2, which reads: "Sixty million dollars is established as the limit of the funded debt of the State at any time outstanding and unpaid. Bonds and other instruments of indebtedness in excess of such limit may be issued when authorized by a two-thirds vote of all the members to which each house of the legislature is entitled, provided such excess debt, at the time of authorization, would not cause the total of state in-

debtedness to exceed a sum equal to fifteen percent of the total of assessed values for tax rate purposes of real property in the State, as determined by the last tax assessment rolls pursuant to law."

Condensed, the essential facts of the case are that Acts 22 and 23 were passed by a two-thirds vote of each house of the legislature and that as of the date of their enactment:

(1) There were outstanding and unpaid bonds, issued by the Territory of Hawaii, of the following types and amounts:

| | |
|---|---:|
| General Obligation | $115,262,000 |
| Highway Revenue | 49,225,000 |
| Aviation Revenue | 14,000,000 |
| | $178,487,000; |

(2) There were unused authorizations for the issuance of general obligation bonds, under Acts passed by the Territorial legislature, in the total amount of $58,494,753; and

(3) Fifteen percent of the total of assessed values for tax rate purposes of real property in the State was $172,859,671.

A determination of the primary issue raised herein, the validity vel non of Acts 22 and 23, depends upon the determination of two subsidiary questions, namely: (1) how are the highway and aviation revenue bonds, aggregating $63,225,000, to be considered in computing, under Article VI, "the total of state indebtedness" as of the date of such Acts, and (2) how is the $58,494,753 of unused Territorial bond authorizations to be considered in the same respect?

On the ultimate issue before us it is the holding of Mr. Justice Marumoto, joined by Mr. Justice Wirtz, that Acts 22 and 23 are invalid. I concur in that holding and thereby

make it the ruling and judgment of the court in this case. However, as I do not concur in the entire opinion of Mr. Justice Marumoto and do concur in part with the dissenting opinion of the Chief Justice and Mme. Justice Lewis, it is in order to indicate my position respecting the two subsidiary issues so that the alignment of the members of the court on the issues and the basis for the ruling in this case shall be directly made to appear.

It is my position that both the highway revenue bonds and the aviation revenue bonds are to be included in determining the amount of the outstanding and unpaid funded debt of the State. I agree with the underlying reasoning and concur in the holding of the prevailing opinion to that effect.

In respect to the authorizations for the issuance of general obligation bonds under the several Territorial Acts which have not been resorted to, I disagree with the holding in the prevailing opinion that $17,605,011 of these bonds may be issued and that such amount is to be included in determining the outstanding State indebtedness for the purpose of ascertaining whether the fifteen percent of assessed valuations has been reached. In this connection I agree with the dissenting opinion that, for the purpose of determining excessive debt limitation under the proviso of the second paragraph of section 3 of Article VI, no part of the $58,494,753 of the unissued bonds authorized by the Territorial Acts is to be considered or included.

In conformity with the foregoing, it is my conclusion that since the $63,225,000 of highway revenue bonds and aviation revenue bonds added to the $115,262,000 of outstanding general obligation bonds exceeded the applicable maximum debt limitation of $172,859,671, the legislature was without power to authorize the incurrence of any further bonded indebtedness and that, therefore, Act 22 and Act 23 are invalid and ineffective.

Our views do not coincide with those of the members of this court who hold that the general obligation bonds provided for in Acts 22 and 23, First Special Session, First Legislature, State of Hawaii, may not be issued. Accordingly, we are impelled to respectfully dissent.

The ultimate question submitted on agreed statement of facts is whether defendant, as director of the budget, can legally issue, sell and deliver $6,000,000 worth of general obligation bonds authorized by Act 22 and an additional $5,000,000 worth of general obligation bonds authorized by Act 23.

In order to resolve that question, it is incumbent upon us to consider and determine the status of certain bonds issued or authorized prior to August 21, 1959, the date when Hawaii attained statehood, and the countability of those bonds in the computation of the total of State indebtedness under the provisions of the State Constitution. This brings up two issues upon which the members of the court are divided, to wit:

(1) Are the $63,225,000 of highway and airport revenue bonds to be counted in determining, within the meaning of Article VI, section 3, paragraph 2, the "total of state indebtedness" which would be caused by the debt authorized by Acts 22 and 23?

(2) Are the territorial general obligation bond authorizations in the amount of $58,494,753, or any amount thereof, to be added to the $115,262,000 of outstanding general obligation bonds in determining, within the meaning of Article VI, section 3, paragraph 2, the "total of state indebtedness" which would be caused by the debt authorized by Acts 22 and 23?

We are of the view that the highway and airport revenue bonds and the territorial general obligation bond authorizations are not to be counted, except to the extent that provision has been made for the carrying out of the

territorial general obligation bond authorizations by Acts 22 and 23 themselves. The question in difference requires consideration of certain pertinent provisions of Article VI, section 3, and of Article XVI, State Constitution.

ARTICLE VI, SECTION 3.

[Par. 1] "All bonds and other instruments of indebtedness issued by or on behalf of the State or a political subdivision thereof must be authorized by the legislature, and bonds and other instruments of indebtedness of a political subdivision must also be authorized by its governing body.

[Par. 2] "Sixty million dollars is established as the limit of the funded debt of the State at any time outstanding and unpaid. Bonds and other instruments of indebtedness in excess of such limit may be issued when authorized by a two-thirds vote of all the members to which each house of the legislature is entitled, provided such excess debt, at the time of authorization, would not cause the total of state indebtedness to exceed a sum equal to fifteen percent of the total of assessed values for tax rate purposes of real property in the State, as determined by the last tax assessment rolls pursuant to law.

[Par. 3] "Instruments of indebtedness to meet appropriations for any fiscal period in anticipation of the collection of revenues for such period or to meet casual deficits or failures of revenue, which shall be payable within one year, and bonds or other instruments of indebtedness to suppress insurrection, to repel invasion, to defend the State in war or to meet emergencies caused by disaster or act of God, may be issued by the State under legislative authorization without regard to any debt limit.

[Par. 6] "All bonds or other instruments of indebtedness for a term exceeding one year shall be in

serial form maturing in substantially equal annual installments, the first installment to mature not later than five years from the date of the issue of such series, and the last installment not later than thirty-five years from the date of such issue. Interest and principal payments shall be a first charge on the general revenues of the State or political subdivision, as the case may be.

[Par. 7] "The provisions of this section shall not be applicable to indebtedness incurred under revenue bond statutes by a public enterprise of the State or political subdivision, or by a public corporation, when the only security for such indebtedness is the revenues of such enterprise or public corporation, or to indebtedness incurred under special improvement statutes when the only security for such indebtedness is the properties benefited or improved or the assessments thereon."

## ARTICLE XVI

"Section 2. All laws in force at the time this constitution takes effect and not inconsistent therewith, including, among others, acts of the Congress relating to the lands in the possession, use and control of the Territory of Hawaii, shall be the laws of the State and remain in force, mutatis mutandis, until they expire by their own limitation, or are altered or repealed by the legislature.

"Except as otherwise provided by this constitution, all existing writs, actions, suits, proceedings, civil or criminal liabilities, prosecutions, judgments, sentences, orders, decrees, appeals, causes of action, contracts, claims, demands, titles and rights shall continue unaffected notwithstanding the taking effect of this constitution, except that the State shall be the legal successor to the Territory in respect thereof, and may be maintained, enforced or prosecuted, as the case may

be, before the appropriate or corresponding tribunals or agencies of or under the State or of the United States, in the name of the State, political subdivision, person or other party entitled to do so, in all respects as fully as could have been done prior to taking effect of this constitution.

"Section 3. The debts and liabilities of the Territory shall be assumed and paid by the State, and all debts owed to the Territory shall be collected by the State.

"Section 4. All acts of the legislature of the Territory authorizing the issuance of bonds by the Territory or its political subdivisions are approved, subject, however, to amendment or repeal by the legislature, and bonds may be issued by the State and its political subdivisions pursuant to said acts. Whenever in said acts the approval of the President or of the Congress is required, the approval of the governor shall suffice."

At the time of the Constitutional Convention, the Territory was governed by the Hawaiian Organic Act and other acts of Congress. The provisions regulating the issuance of bonds and the incurrence of indebtedness were changed or added to as set out in the appended note. It is by reason of such changes, during territorial status, not anticipated by the framers of the Constitution, that is to say, by reason of changes made in the interim between the framing and adoption of the Constitution in 1950 and the admission of the State in 1959, that the question in difference has arisen. The unforeseen delay in the admission of the State has interfered with the smooth transition into statehood for which the framers endeavored to provide.

The Constitution was agreed upon by the delegates in convention on July 22, 1950. It was adopted by a vote of the people of Hawaii in the election held on November 7, 1950. The Congress accepted the Constitution, subject to

the adoption by the people of three propositions set out in section 7(b) of the Admission Act, the Act of March 18, 1959, P.L. 86-3 (73 Stat. 4). These propositions (which effected certain amendments of the Constitution in areas not here involved) were adopted at an election held on June 27, 1959. This was proclaimed by the President, and the State was admitted, on August 21, 1959.

The provisions of a state constitution are limiting, the power existing unless the constitution otherwise provides. This rule, as applied to the subject at hand, is well stated in *State ex rel Capitol Addition Building Comm'n* v. *Connelly,* 39 N.M. 312, 46 P. 2d 1097, 100 A.L.R. 878, as follows:

> "The debt limitation provisions of our State Constitution are just what the term implies, 'limitations' and not 'grants' of power. * * * the power of the Legislature [is] plenary in the matter of incurring indebtedness, except as limited by the Constitution."

As provided in the Constitution, it took effect "immediately upon the admission of Hawaii into the Union as a State" i.e., August 21, 1959. The provisions of the Constitution are prospective, not retrospective, unless the contrary clearly appears. 11 Am. Jur., *Constitutional Law,* § 35; 16 C.J.S., *Constitutional Law,* § 40a; *Shreveport* v. *Cole,* 129 U.S. 36.

Section 3 of Article VI contains requirements as to the "bonds and other instruments of indebtedness" which may be issued "by or on behalf of the State."

By the sixth paragraph of this section it is required that: "Interest and principal payments shall be a first charge on the general revenues of the State." Accordingly we start with the proposition that, in authorizing the issuance of bonds, the State Legislature is limited to general obligation bonds.

The only exceptions to the requirement of issuance of

general obligation bonds are contained in the seventh paragraph of the section. It has been argued that the highway and aviation revenue bonds could not have been issued under this paragraph.

It is not necessary to decide whether the State could or could not have issued the highway and aviation revenue bonds under the seventh paragraph. If it could have, then of course there would be no instrument of indebtedness already issued by the Territory which could not have been issued by the State. Each existing instrument would be classifiable as either a general obligation or a revenue bond. It then would be beyond doubt that only general obligation bonds were to be counted in determining the total of State indebtedness within the meaning of the second paragraph.

If the State could not have issued the highway and aviation revenue bonds under the seventh paragraph, the interpretation of the second paragraph is not so simple. We then have bonds which are not classifiable as either general obligation bonds or revenue bonds, and we are confronted with the question whether they nevertheless fit into the pattern of section 3 of Article VI of the State Constitution.

The territorial laws and congressional acts under which these bonds were issued—see paragraph (f) of the appended note—provided that they were payable from fuel taxes, and in the case of the aviation revenue bonds, also from rents, fees, and other charges of the Hawaii Aeronautics Commission. It was required that each bond state that it was not a general obligation of the Territory.

For present purposes, we assume that the bonds so issued by the Territory could not have been issued by the State under the seventh paragraph. As contracts already made they nevertheless are valid, and were assumed by the State under Article XVI, section 3. That is beyond question. See *Baxter* v. *State,* 9 Wis. 32; *Jewell Nursery*

*Co.* v. *State,* 4 S.D. 213, 56 N.W. 113; *Chicago, R. I. & P. R. Co.* v. *Taylor,* 79 Okla. 142, 192 Pac. 349. The pertinent question is whether the debt limit provisions of the second paragraph, section 3, Article VI, are affected by them. We turn therefore to the interpretation of that paragraph.

The second paragraph has to do only with the issuance of general obligation bonds by the State. This is by reason of the sixth paragraph. The amount of general obligation bonds issuable by the State is limited by the first sentence of the second paragraph, which establishes $60,000,000 "as the limit of the funded debt of the State at any time outstanding and unpaid."

In the computation of outstanding debt there sometimes is a problem as to whether general obligation bonds, which have been issued for construction of certain works under an exception to the debt limit, are to be counted in determining the available margin for issuance of general obligation bonds which are subject to the debt limit. See *City of Truth or Consequences* v. *Robinson,* 58 N.M. 111, 266 P. 2d 356; *Knight* v. *Allen,* 109 S.E. 2d 585 (S.C. 1959); *Iron Products Inv. Co.* v. *City of Picher, Oklahoma,* 83 F. 2d 443 (10th Cir. 1936), and cases cited; *cf., Austin* v. *Snodgrass,* 209 Ala. 353, 96 So. 139; *State ex rel Luscombe* v. *Kansas City,* 101 Kan. 806, 168 Pac. 907; *Keplinger* v. *Kansas City,* 122 Kan. 158, 251 Pac. 413; *Adams* v. *East River Savings Institution,* 20 N.Y.S. 12, S. Ct., Gen. Term, 2d Dept., aff'd 136 N.Y. 52, 32 N.E. 622. There could be no such difficulty here as to the bonds issued under the seventh paragraph, which are not general obligation bonds and to which, by express provision of the seventh paragraph, the provisions of section 3 "shall not be applicable."

This brings us to consideration of the maxim "expressio unius est exclusio alterius." The maxim undoubtedly signifies that a stated exception presupposes there are no other exceptions. However, the maxim is not of invariable

application. It should not be applied when other provisions, or the surrounding circumstances, indicate that a different result is called for. 11 Am. Jur., *Constitutional Law*, § 57; *In re Opinion of the Justices*, 248 Ala. 590, 29 So. 2d 10; *Nunnemacher* v. *State*, 129 Wis. 190, 108 N.W. 627; *Collingsworth County* v. *Allred*, 120 Tex. 473, 40 S.W. 2d 13; *Matter of Buoneto* v. *Buoneto*, 278 N.Y. 284, 16 N.E. 2d 284; see also *Gangemi* v. *Berry*, 25 N.J. 1, 134 A. 2d 1. The maxim is to be used with other rules of construction, and among them is the rule that the established usage is presumed intended, unless negatived. 2 Sutherland, *Statutory Construction*, § 4917, note 14 (3d ed.) ; *Bland* v. *Commissioner of Internal Revenue*, 102 F. 2d 157 (7th Cir. 1939) ; see also *State ex rel White* v. *Grant Superior Court*, 202 Ind. 197, 172 N.E. 897; *United States* v. *Sweeny*, 157 U.S. 281.

Here at first blush it appears that the exception of certain indebtedness from the provisions of section 3, Article VI, made by the seventh paragraph of that section, signifies that all other types of indebtedness will be subject to the provisions of the section. But this must be laid aside when we look at the remainder of the section, and the surrounding circumstances, and see what types of indebtedness were in view. Upon full consideration, we have concluded that the seventh paragraph of section 3, Article VI, should not be given retrospective effect to include in the computation of the available margin of debt limit all territorial bonds which do not meet the requirements of that paragraph.

On the assumption that the highway and aviation revenue bonds could not have been issued under the seventh paragraph of section 3, Article VI, it equally would follow that they could not have been issued by the Territory under the Act of August 3, 1935, 49 Stat. 516, c. 436 (48 U.S.C.A. 562d), paragraph (d) of the appended

note, and were beyond the power of the Territory and wholly uncontemplated at the time the Constitution was written. It must be remembered that bonds of this type were dependent upon the guarantee of the levy of a particular type of tax, but during territorial status Congress could have nullified the tax if the power to guarantee the levy had not been obtained. See as to the retention by Congress of legislative control over territorial legislation, *Mormon Church* v. *United States,* 136 U.S. 1, 43; *Inter-Island Steam Navigation Co.* v. *Hawaii,* 305 U.S. 306, 314; *National Bank* v. *County of Yankton,* 101 U.S. 129.

That bonds of this type were not contemplated appears also from Standing Committee Report No. 51 of the Committee on Taxation and Finance of the Constitutional Convention. See the portion of the committee report relating to what was then section 10 providing for debt limitations.

Hence, it was contemplated that the $60,000,000 of funded debt would consist of general obligation bonds.

For convenience, we have used the expression "bond" throughout this opinion to signify any instrument of indebtedness which is part of the "funded debt." Possibly the funded debt includes instruments of indebtedness payable within one year, issuable under the first portion of the third paragraph of section 3, which are not "bonds." However, to the extent that such instruments are part of the funded debt they also come under the requirement that: "Interest and principal payments shall be a first charge on the general revenues of the State." This sentence, now part of the sixth paragraph of section 3, originally was a separate paragraph. It was combined into the sixth paragraph by the Committee on Style, Standing Committee Report No. 122. Its effect is not confined to bonds. Hence all of the instruments issued under the Constitution as part of the funded debt, unless issued under

the seventh paragraph, necessarily constitute general obligations.

We note the provisions of the third paragraph, though the effect of instruments issued thereunder on the computations under the second paragraph is a question not before us. The permission to issue instruments of indebtedness under the third paragraph "without regard to any debt limit" does not necessarily signify that, when issued, the debt so incurred will not be counted in determining "the funded debt of the State * * * outstanding and unpaid" ("the total of state indebtedness") within the meaning of the second paragraph. It may very well be that some or all of the instruments issued under the third paragraph will have to be counted for purposes of the second paragraph.

Considering now the second sentence of the second paragraph, this is a provision whereby the legislature by a two-thirds vote may set aside the $60,000,000 limit and authorize "excess debt," i.e., debt in excess of $60,000,000. The "excess debt" so authorized could consist only of general obligation bonds by reason of the sixth paragraph.

It is provided that the excess debt, at the time of authorization, shall not cause the total of State indebtedness to exceed "a sum equal to fifteen percent of the total of assessed values for tax rate purposes of real property in the State, as determined by the last tax assessment rolls pursuant to law." This provision contemplates that the legislature will measure the amount of excess debt authorizations, using only such margin as remains between "the funded debt of the State * * * outstanding and unpaid" and the 15% figure, except that no such measure need be applied if the purpose is to defend the State or to meet other needs set out in the third paragraph.

It again was not contemplated that the margin thus carefully provided for general obligation bonds would be

absorbed by other types of bonds which as we have assumed were not within the power of the Territory in 1950, and which subsequently were issued pursuant to a grant to the Territory of further power made on the theory that there was not involved any debt which needed to be measured against assessed values. And since the debt limit at the time of writing of the Constitution was 10% of assessed values, as compared with 15%, with an alternate limit of $50,000,000 under the Act of October 26, 1949, 63 Stat. 926, c. 754 (48 U.S.C.A., sec. 562m), as compared with $60,000,000, it seemed to the framers of the Constitution that the general obligation bonds of the Territory could not use up this margin and some would remain for the State Legislature to act upon by an excess debt authorization by two-thirds vote. This in itself is a reason why only general obligation bonds of the Territory should be considered, for purposes of the second paragraph, in determining the amount of the funded debt outstanding and unpaid at the time of admission of the State. Otherwise the general obligation bonds would be limited below the amount intended to be authorized. See *Eastern Kentucky Lunatic Asylum* v. *Bradley,* 101 Ky. 551, 41 S.W. 556; *City of Tiffin* v. *Griffith,* 74 Ohio 219, 77 N.E. 1075.

The circumstances were the same when the Constitution was adopted at the election held November 7, 1950. And if we consider the intention of the people when they voted at the election held on June 27, 1959, the highway and aviation revenue bonds then were provided for by acts of Congress which specifically stated that their issuance should "not constitute an indebtedness within the meaning of the Hawaiian Organic Act," and the Constitution contained no provision repudiating the territorial practice under which only the general obligation bonds were counted in applying the debt limit.

In territorial practice, the curb on revenue bonds was

the control of Congress over the legislative power, not the debt limit. That which was authorized as a revenue bond was thenceforth deemed outside the debt limit. It was taken for granted that only general obligation bonds would be counted in applying the debt limit. (See Sen. Rep. No. 2353, 84th Cong., 2d Sess., which accompanied H.R. 9768 enacted as P.L. 720, approved July 14, 1956, 70 Stat. 552, c. 606; Sen. Rep. No. 2155, 85th Cong., 2d Sess., which accompanied H.R. 11954, enacted as P.L. 85-691, approved August 20, 1958, 72 Stat. 685.) In connection with the airport revenue bonds it was stated in Sen. Rep. No. 1800, 85th Cong., 2d Sess., accompanying H.R. 10347, which became P.L. 85-534, approved July 18, 1958 (72 Stat. 379):

> "The committee members are satisfied that the issuance of the bonds will not constitute the incurrence of an indebtedness within the meaning of the Hawaiian Organic Act, and will not be a general obligation of the Territory, * * *."

Though this practice was expressed in the acts of Congress, the same result would have followed if this had not been expressed.

Special funds for the payment of the highway and aviation revenue bonds were provided by the congressional enactments of 1956 and 1958, and the obligation to the bondholders was limited thereto. This in itself showed that the bonds so issued were not to be counted in applying the debt limit. As stated in *State ex rel Syvertson* v. *Jones*, 74 N.D. 465, 23 N.W. 2d 54, 63, when a later provision of the organic law authorizes the payment of obligations out of a special fund, obligations payable solely out of that fund are "not to be considered in determining the extent of the debt limit," prescribed by an earlier provision of the organic law; see also *State ex rel State Road Comm.* v. *O'Brien*, 140 W.Va. 114, 82 S.E. 2d 903; *Johnson* v. *Mc-*

*Donald,* 97 Colo. 324, 49 P. 2d 1017; *cf., Curlin* v. *Wetherby, infra,* which rejected the special fund doctrine even when the special fund had been created by a constitutional provision.

The special funds hypothecated by the congressional enactments of 1956 and 1958, subsequent to the framing of the Constitution in 1950, were continued by the State Constitution upon admission of the State in 1959 by assumption of the contracts made. The hypothecation of these special funds was an accomplished fact and beyond legislative control. Only if clearly required should bonds so issued be counted in applying the debt limit of the State.

The word "funded," in the term "funded debt," differentiates funded debt from floating debt. We do not dispute that debt is "funded" when it exists "in the form of obligations to pay interest, and in the case of bonds the principal also, at certain fixed dates." Webster's New International Dictionary, Second Edition, Unabridged, on definition of "funded." Indeed, the third paragraph of the debt limitation section as it read in the Committee Proposal No. 10, RD 1, attached to Committee of the Whole Report No. 18, made this clear in providing for "Instruments of indebtedness to *fund* appropriations for any fiscal period." The underscored word was changed, but without any change in substance, by Standing Committee Report No. 122 of the Style Committee, that is, the word "fund" was deleted at this point and the word "meet" inserted instead.

Though "funded debt" is that represented by instruments of indebtedness, this is not decisive of the point before us. The meaning of the word "debt" still remains a question, and presents a choice between two definitions, each of which is supported by respectable authority. We have accepted the definition which represents both territorial practice and also that which was contemplated by

the framers of the Constitution, that is, that the debt limited by the debt limit provisions consists of general obligations. The limits on other types of debt are to be found elsewhere.

We follow that line of cases which holds that "debt" within the meaning of a constitutional provision which fixes the debt limit, means "one pledging the general faith and credit of the state * * *, with a consequent right in the holders of such indebtedness to look to the general taxing power to satisfy the same." *State ex rel Capitol Addition Building Comm.* v. *Connelly, supra; Stone* v. *City of Hobbs,* 54 N.M. 237, 220 P. 2d 704; *Briggs* v. *Greenville County,* 137 S.C. 288, 135 S.E. 153; *Alabama State Bridge Corp.* v. *Smith,* 217 Ala. 311, 116 So. 695; *State ex rel Bugge* v. *Martin,* 38 Wash. 2d 834, 232 P. 2d 833; *Ziegler* v. *Witherspoon,* 331 Mich. 337, 49 N.W. 2d 318, 326. Especially is this interpretation called for when the debt limit is expressed as a percentage of assessed value and is placed upon "debts" and not upon "debts and liabilities." *State ex rel Capitol Addition Building Comm.* v. *Connelly, supra; cf., State ex rel Diederichs* v. *State Highway Comm.,* 89 Mont. 205, 296 Pac. 1033, and *Behnke* v. *New Jersey Highway Authority,* 13 N.J. 14, 97 A. 2d 647, which applied a different interpretation when liabilities were limited as well as debts.

It has been argued that the use of a percentage of assessed value as a measure of the State debt limit is without significance, since the real property tax is a county revenue. However, as explained by the chairman of the Committee on Taxation and Finance during debate in the Committee of the Whole upon consideration of the debt limit provisions, June 19, 1950:

"* * * the people that buy the bonds are interested in the ratio of your debts to your assessed value because while all of the tax revenues of the State or the counties

> naturally are available for the payment of the debt, it's been customary for bondholders to look to the real property tax as their real collateral."

It is noteworthy that the power to impose a real property tax is reserved to the State by Article VII, section 3, so that this customary collateral may be looked to when the general faith and credit of the State are pledged as is done in the case of general obligation bonds, even though there be no real possibility that resort to the real property tax will be necessary.

The principle set forth in the line of cases we follow is referred to as the "special fund doctrine." See annotations in 72 A.L.R. 687, 96 A.L.R. 1385, 100 A.L.R. 900, 146 A.L.R. 328. It is argued that this doctrine should not be followed, as there is no end to the amounts and varieties of taxes which could be impounded in special funds, thereby riddling the constitutional debt limit by the simple expedient of avoiding the undertaking of a general obligation. According to some cases: "An instrument that is to be paid through a tax levied by the State, is a State debt. * * * The special fund doctrine * * * does not extend to obligations payable from taxes, which, in whatever form the legislature may collect them, are State revenues." *People ex rel City of Chicago* v. *Barrett*, 373 Ill. 393, 26 N.E. 2d 478; *Boswell* v. *State*, 181 Okla. 435, 74 P. 2d 940; *Curlin* v. *Wetherby*, 275 S.W. 2d 934 (Ky. 1955).

This argument would be a good one if the second paragraph of section 3 stood alone. Instead, it is supplemented by the sixth and seventh paragraphs. These paragraphs govern all bond issues from and after the admission of the State. The sixth paragraph precludes resort by the State Legislature to the special fund doctrine except as permitted by the seventh paragraph. Thus the limits on the special fund doctrine are to be found in the sixth and seventh paragraphs, not the second paragraph.

If the meaning of "debt" stated in the above cited Illinois case should be applied, it would be only insofar as instruments issued by the Territory are concerned. It is clear that, so far as instruments issued by the State are concerned, only general obligation bonds are referred to in the second paragraph. There could be only one reason for applying the Illinois rule to the instruments issued by the Territory, i.e., to reduce the amount of general obligation bonds which can be issued by the State, in order to compensate for the "tax anticipation bonds" issued by the Territory, to use the plaintiff's nomenclature. However, we do not feel called upon to do this.

The principal question, from the standpoint of amount, arises from the highway bonds. These were issued for "an accelerated highway improvement program" under "plans for a 5-year highway program that normally would be constructed over a span of 15 years." Sen. Rep. No. 2354, 84th Cong., 2d Sess. accompanying H.R. 7426, which became the Act of July 14, 1956, 70 Stat. 545, c. 602 (48 U.S.C.A. sec. 562s, et seq.). As further shown by the cited committee report these bond issues were related to the Federal Aid Highway Act of 1954 (68 Stat. 70, c. 181), which had made increased apportionments of federal aid money as part of a national policy of stepping up highway construction (Sen. Rep. No. 1093, 83d Cong., 2d Sess., accompanying S. 3184, the text of which was substituted for the language of H.R. 8127, enacted as the Federal Aid Highway Act of 1954). Congress recognized that the method of payment of these bonds was in general use, and expressed no concern over the effect of the bonds on the credit of the Territory. It was stated in the above cited Sen. Rep. No. 2354, 84th Cong., 2d Sess.: "Act 250, Session Laws of Hawaii, 1955, provides for a 1 cent per gallon increase in the Territorial liquid fuel tax. Proceeds realized from this tax will meet the requirements of the

208

highway program described above. Many States are financing their highway programs in this manner."

This accelerated program is not comparable to the highway program which, as conducted in the past, was known to the delegates to the Constitutional Convention. In the past the fuel tax customarily had been earmarked by a legislative continuing appropriation for highway purposes, including payment of general obligation bonds issued for those purposes. That was a different method of financing highways. At the time of the Constitutional Convention there was no established practice of counting, as "debt," bonds issued in the manner that the highway bonds later were issued to finance the accelerated program under the 1956 congressional authorization. To the contrary, under territorial practice it was taken for granted that only general obligation bonds would be counted.

The framers of the Constitution geared the debt limit to the assessed values in order to provide a "flexible debt limit," and because: "Permitting the debt limit to be increased by using a fixed percentage of the assessed valuation will provide a much more stable ceiling than using revenues collected." Standing Committee Report No. 51 (see portion of committee report relating to what was then section 10 providing for debt limitations). Thus there was no intention to gear the debt limit and available revenues in any exact manner. Instead reliance was placed upon the good judgment of the legislature. As stated in Standing Committee Report No. 51, *supra,* the "maximum percentage indebtedness":

> "* * * is higher than authorities in the field of public finance generally believe should be allowed for state and local indebtedness in order to assure a ready sale of their bonds at reasonable rates of interest, and care should be exercised to keep the actual indebtedness as much below these limits as possible, * * *."

Plaintiff argues that the highway and aviation revenue bonds imposed upon the Territory such liabilities as to cause them to be considered general obligations. Of course, the State has assumed all of the liabilities of the Territory pursuant to Article XVI, section 3, as already noted. However, the argument is effectively answered by *Von Damm* v. *Conkling,* 23 Haw. 487, which was followed in *E. E. Black, Ltd.* v. *Conkling,* 33 Haw. 731.

For the foregoing reasons we have concluded that the issuance of general obligation bonds by the State is not limited by reason of the issuance of the highway and aviation revenue bonds by the Territory. If we assume that they do not constitute revenue bonds within the meaning of the seventh paragraph, this simply means that they do not fit into the pattern of section 3 at all. There is no necessity that they should.

We also have concluded that the issuance of general obligation bonds by the State is not limited by reason of the $58,494,753 of unissued general obligation bonds, which had been authorized by the Territorial Legislature but were not outstanding at the time of admission of the State.

There are two limits provided by the Constitution, i.e.:

The $60,000,000 limit, which is self-executing, and which governs the amount of debt "outstanding and unpaid," calling for a computation at the time of issuance of bonds; and

The 15% limit, which is not self-executing, and which governs the amount of "excess debt" authorizations, calling for a computation "at the time of authorization."

This was clearer in Committee Proposal No. 10, RD 1, attached to Committee of the Whole Report No. 18, than in the final form adopted on the recommendation of Standing Committee Report No. 122 of the Style Committee. Nevertheless, the substance remains the same.

Except for bonds which may be issued without regard to the debt limit (see third paragraph of section 3, Article VI), no general obligation bonds may be issued at a time when the outstanding and unpaid "funded debt" amounts to $60,000,000, unless: (1) the "excess debt," i.e., State funded debt o u t s t a n d i n g and unpaid in excess of $60,000,000, is authorized by a two-thirds vote of the legislature, and (2) at the time of the authorization it can be carried out, and the bonds then and there issued, without causing the total to exceed the 15% limit.

Prior authorizations which can be carried out must be considered when "excess debt" is voted. Otherwise the authorization last voted might cause the "excess debt" to pass the 15% limit. But only those authorizations which can be carried out at a time when the $60,000,000 mark has been reached, i.e., only those for which an excess debt authorization has been provided, need be considered.

Plaintiff has argued that under section 4 of Article XVI, the $58,494,753 of unissued general obligation bonds, which had been authorized by the Territorial Legislature, all could be issued without regard to the debt limit and therefore must be considered.

Section 4 of Article XVI was added to Committee Proposal No. 23 of the Committee on Ordinances and Continuity of Law, during Committee of the Whole consideration of that proposal. As explained in Committee of the Whole Report No. 25, section 2 of the redrafted proposal reported by the Committee of the Whole, which became section 2 of Article XVI, was a new form of several sections of the original committee proposal. The committee report stated that the new form "includes and fully covers, among other things, all matters covered by the original sections" having the advantage of "being couched in broader and therefore more inclusive terms, and of greater brevity." The new section 4 was deemed, as stated in

Committee of the Whole Report No. 25, "undoubtedly fully covered by the broader provisions of section 2 * * * and by a further general provision in Committee Proposal No. 24," reference here being made, apparently, to the section which became section 3 of Article XVI. However, section 4 was included because:

"* * * your Committee felt that due to (1) the great importance of maintaining the credit of the state in respect of its past bonded indebtedness (to be inherited from the Territory) and proposed future bond issues, (2) the necessity of expressly providing a substitute for the provisions of territorial laws authorizing bonds not yet issued, which require Congressional or Presidential approval, and (3) the rigid scrutiny given to our laws by mainland bond attorneys whenever a bond issue is proposed, it would be wise to have a separate section dealing expressly with such territorial bond laws."

Had it been intended that these prior authorizations would be carried out without regard to the debt limit, that easily could have been said, as in the third paragraph of section 3, Article VI.

As originally reported by the Committee on Taxation and Finance, Standing Committee Report No. 51, the debt limitation provision of Committee Proposal No. 10, which became the second paragraph of section 3, Article VI, carried the figure $50,000,000 instead of $60,000,000. The latter figure was reported by Committee of the Whole Report No. 18 and adopted.

On June 19, 1950, in explaining to the Committee of the Whole the original $50,000,000 figure, the chairman of the Committee on Taxation and Finance said:

"In the case of the Territory they have a 50 million debt limit now, but on—outstanding and authorized but unissued bonds amounts to about 56 million. How-

ever there are a number of those issues that I understand that not much chance that they will be sold."

On June 22, 1950, the chairman of the Committee on Taxation and Finance submitted the new $60,000,000 figure to the Committee of the Whole, pointing out that the authorizations at that time, both issued and unissued, totaled $56,000,000. This was more than 15% of the then assessed value of $333,643,899. At a later point in the debate of the same day, the chairman of the Committee on Taxation and Finance stated that the purpose of the fixed figure, as distinguished from the percentage of assessed value which was expected to produce a higher limit in future, was as follows:

"* * * you've got authorized—outstanding plus authorized and unissued bonds. That would bring the total up to 56 million. So in other words, we are trying to take care of the situation that exists at the present time until such time as we could catch up with it."

Had it been intended that territorial authorizations would be carried out without regard to the State debt limit, there of course would have been no object in considering whether the State debt limit was high enough to permit them to be issued.

Nothing in connection with the later addition of section 4 of Article XVI suggests a new purpose to permit territorial authorizations to be carried out without regard to the State debt limit. To the contrary, the intention was to carry out the original purpose of the Committee of the Whole in connection with the redrafted Committee Proposal No. 10. The text of section 4 of Article XVI had been recommended for consideration by the Committee on Ordinances and Continuity of Law, in reporting on Committee Proposal No. 10 in Committee of the Whole Report No. 18. The recommendation was carried out at the time of consideration of Committee Proposal No. 23, as above stated.

Had the outstanding bonds remained well below $60,000,000 as was the situation at the time of the Constitutional Convention, the prior territorial authorizations could have been carried out under section 4 of Article XVI without more ado. When, in the long interim before admission of the State the $60,000,000 limit was so greatly exceeded, section 4 no longer had practical significance though the territorial acts referred to therein were continued in force. By reason of the excessive State indebtedness the territorial acts became dormant, to remain so until and unless either the total State indebtedness was reduced to a point below $60,000,000, or else the State Legislature by two-thirds vote, under the second sentence of the second paragraph, section 3, Article VI, provided for issuance of these bonds.

Section 4 of Article XVI is a part of the transitional provisions of the Constitution, intended to take care of a temporary situation upon the admission of the State. *Ketchikan Packing Co.* v. *Seaton,* 267 F. 2d 660 (D.C. Cir. 1959). As a temporary provision, it is to be construed in such manner as to carry out the general design. *People ex rel Jackson* v. *Potter,* 47 N.Y. 375, 380; see also the following transitional cases: *State ex rel Johnson* v. *Hitchcock,* 1 Kan. 173; *State* v. *McNally,* 13 Utah 25, 43 Pac. 920; *Driscoll* v. *Jones,* 1 S.D. 8, 44 N.W. 726; *Independent Cotton Oil Co.* v. *Beacham,* 31 Okla. 384, 120 Pac. 969; *St. Louis & S.F.R. Co.* v. *Rushing,* 31 Okla. 231, 120 Pac. 873; *Muskogee Vitrified Brick Co.* v. *Napier,* 34 Okla. 618, 126 Pac. 792; *Cusic* v. *Douglass,* 3 Kan. 117; *St. Paul and Tacoma Lumber Co.* v. *Northern Pacific Ry.,* 296 Fed. 749, rev'd on other grounds 4 F. 2d 359, app. dism'd 269 U.S. 535; *cf., Border* v. *Carrabine,* 30 Okla. 740, 120 Pac. 1087 and cases cited; *Yavapai County* v. *Stephens,* 20 Ariz. 115, 177 Pac. 261.

It is suggested that section 4 says more than section 2,

in that section 2 preserved only laws in force upon the admission of the State "not inconsistent" with the State Constitution. If we assume that section 4 eliminated the words "not inconsistent," so far as the mentioned bond authorization acts of the Territorial Legislature are concerned, that reading does not affect the result—for it does not appear that these acts are inconsistent with the State Constitution. This section 4 was inserted only out of abundance of caution, as shown by the above quoted committee report.

Though the territorial acts recognized the congressional control over the territorial debt limit, and sometimes petitioned Congress on that subject, they could not and did not legislate thereon. Thus, to attribute to those acts a significance "inconsistent" with the State Constitution is to give them a meaning they did not have when enacted. At the time of enactment there was not (except for emergency purposes which are not involved) any power in the territorial legislature to lift or set aside any debt limit, and under the territorial acts the bond authorizations made by them had to await issuance until and as permitted by the organic law. As approved by section 4 they stand the same. See *San Antonio* v. *San Antonio Public Service Co.*, 255 U.S. 547.

If section 4 of Article XVI perpetuated the debt limit set by Congress, that would have had a strange result had admission occurred promptly, as was expected by the framers of the Constitution. At that time the debt limit set by Congress was $50,000,000; hence section 4, so read, would have invalidated that which it was intended to validate. That is, section 4 would have invalidated the $6,000,000, more or less, of territorial general obligation bond authorizations in excess of the $50,000,000 limit.

It will be noted that section 4 says nothing about "acts of the Congress," though section 2 does. Section 4 does

not employ the general term "laws in force," though section 2 does. Even if strong emphasis is placed on the words "pursuant to said acts," contained in section 4, nevertheless only acts of the Territorial Legislature are referred to by section 4. This reference cannot be deemed to supply that which was well known to be outside the legislative power of the Territory, namely, the fixing of the debt limit.

Two members of the court have pointed out that, at the time of admission of the State, under the acts of Congress there remained a territorial debt limit margin of $17,000,000, more or less. If the State debt limit already had been reached at the time of admission, there could be no reason for the Constitution to perpetuate this territorial debt limit margin. That would create an exception to the State debt limit having lasting effect for twenty years or more, going far beyond the scope of a transitional provision. However, it is only by counting the highway and aviation revenue bonds that the majority of the court concludes that the State debt limit has been reached.

In summary, the majority of the court would accord the highway and aviation revenue bonds a different treatment for State purposes than was accorded them for territorial purposes, but two members of this majority entertain the view that the territorial treatment is pertinent to a certain extent. These two members would apply the territorial debt limit to territorial authorizations so far as section 4 of Article XVI is concerned. It seems to us that the highway and aviation revenue bonds are essentially the same as they were before, and not to be counted irrespective of whether the new issues under consideration have been territorially authorized or not. We think the difference is one of underlying reasoning, which in the framework of this case calls for a difference in ultimate conclusions.

Turning now to the provisions of Acts 22 and 23, we

note that the purposes of these Acts are certain, i.e., water development projects (Act 22), and acquisition of land, preparation of plans and the construction of State buildings (Act 23). The references to prior authorizations to identify the projects more than cover the amounts authorized. By reference to R.L.H. 1955, § 137-2, it appears that the proceeds of the bonds issued under the Acts will be allocated to the various projects by the Governor, within the limits set by the specification of purposes in the Acts. Whether less definite provisions could have been enacted is a matter not before us.

Holding, as we do, that the excess debt authorizations made by Acts 22 and 23 will not cause the total of State indebtedness to exceed the 15% limit, it is our conclusion that the Acts are valid and in effect.

*Note*

(Appended to dissenting opinion of Tsukiyama, C. J., and Lewis, J.)

(a) Section 55 of the Hawaiian Organic Act, as it read at the time of the Constitutional Convention, provided in part:

"* * * nor shall any debt be authorized to be contracted by or on behalf of the Territory, * * * except to pay the interest upon the existing indebtedness, to suppress insurrection, or to provide for the common defense, except that in addition to any indebtedness created for such purposes the legislature may authorize loans by the Territory, * * * for the erection of * * * public improvements, but the total of such indebtedness incurred in any one year by the Territory * * * shall not exceed 1 per centum of the assessed value of the property in the Territory * * *, and the total indebtedness of the Territory shall not at any time be extended beyond 10 per centum of such assessed value of property in the Territory * * *."

(b)  By the Act of August 20, 1958, P.L. 85-691 (72 Stat. 685), also mentioned in paragraph (h) of this note, Congress deleted the limitation on the amount of indebtedness which might be incurred in any one year.

(c)  The Act of October 26, 1949 (63 Stat. 926, c. 754) provided as follows:

"That, during the years 1949 to 1955, inclusive, the Territory of Hawaii is authorized and empowered to issue, any provision of the Hawaiian Organic Act or any other Act of Congress to the contrary notwithstanding, public-improvement bonds in such amounts as will not cause the total indebtedness of such Territory to exceed $50,000,000. Any extension of the total indebtedness of such Territory beyond $50,000,000 shall be made solely in conformity with the Hawaiian Organic Act."

(d)  The Act of August 3, 1935 (49 Stat. 516, c. 436, 48 U.S.C.A. 562d) read in part as follows:

"That the Legislature of the Territory of Hawaii may cause to be issued on behalf of the Territory * * * bonds and other obligations payable solely from the revenues derived from a public improvement or public undertaking (which revenues may include transfers by agreement or otherwise from the regular funds of the issuer in respect of the use by it of the facilities afforded by such improvement or undertaking). The issuance of such revenue bonds shall not constitute the incurrence of an indebtedness within the meaning of the Hawaiian Organic Act, and shall not require the approval of the President of the United States."

(e)  The Territorial Legislature, by S.L. 1953, Act 211, had provided for the issuance of $20,000,000 of general obligation bonds for financing of veterans' loans. This act was approved by Congress and certain other provisions made by P.L. 640, 83d Cong., 2d Sess., approved August

24, 1954 (68 Stat. 782, c. 889), P.L. 643, 83d Cong., 2d Sess., approved August 24, 1954 (68 Stat. 785, c. 892), P.L. 720, 84th Cong., 2d Sess., approved July 14, 1956 (70 Stat. 552, c. 606), and P.L. 85-691, approved August 20, 1958 (72 Stat. 685). P.L. 640 as amended appears in 48 U.S.C.A. 562n. See paragraphs (g) and (h) of this note.

(f) Highway and aviation revenue bonds were provided for by acts of Congress, P.L. 716, 84th Cong., 2d Sess., July 14, 1956, and P.L. 85-534, approved July 18, 1958. These acts provided that the issuance of the bonds "shall not constitute the incurrence of an indebtedness within the meaning of the Hawaiian Organic Act." The Act of July 14, 1956, approved R.L.H. 1955, sections 137-80 to 137-93, inclusive, added by S.L. 1955, Act 249, which provided for the issuance of highway revenue bonds in the amount of $50,000,000 in accordance with the congressional authorization. The Act of July 18, 1958, approved R.L.H. 1955, sections 137-94 to 137-107, inclusive, added by S.L. 1957, J.R. 32, which provided for the issuance of aviation revenue bonds in the amount of $14,000,000 in accordance with the congressional authorization.

The territorial acts so approved provided that each bond "shall distinctly state that it is not a general obligation of the Territory." The highway revenue bonds were "payable from funds derived from highway vehicle fuel taxes," and the aviation revenue bonds were "payable from funds derived from aviation fuel taxes and all other revenues of the Hawaii Aeronautics Commission, including rents, fees, and other charges," as provided in the acts of Congress.

(g) On the same day as the earlier of the acts cited in paragraph (f) of this note, July 14, 1956, Congress also enacted by P.L. 720, 84th Cong., 2d Sess., a provision later transferred into and made an amendment of the above noted P.L. 640, 83d Cong., 2d Sess., clarifying the relation-

ship between special congressional acts providing for issuance of general obligation bonds notwithstanding the debt limit and the computation of the debt limit when applicable (Sen. Rep. No. 2353, 84th Cong., 2d Sess.). P.L. 720 read in part:

"In applying the Territory's debt limitation, whether prescribed by this or other specific Act of Congress or by the Hawaiian Organic Act, the computation of the amount to which the total indebtedness of the Territory may be extended at any time shall include all general obligation bonds, whether for public improvements or for other purposes for which general obligation bonds are or may be authorized to be issued by the Congress: * * *."

(h) An amendment later was made by the Act of August 20, 1958, P.L. 85-691 above cited, which provided that "the computation * * * shall not include" the general obligation bonds issued pursuant to S.L. 1953, Act 211, and the Act of August 24, 1954, approving the same (paragraph (e) of this note).